# BEVINS v. LIVESAY et al.—221 S. W. (2d) 106.

Eastern Section.  March 15, 1949.

Petition for Certiorari denied by Supreme Court, April 26, 1949.

(1)

2

Schoolfield & Graham, of Chattanooga, for appellants.

Goins & Ganmon and Wilkerson & Wilkerson, all of Chattanooga, for appellees.

McAMIS, J.  This is a suit to rescind, by reason of alleged fraudulent misrepresentations of the earnings of the business, the purchase by complainants from defendants of a dry cleaning plant, equipment and good will valued at $10,000.  After a hearing, the Chancellor granted a recovery for $5,000 paid in cash by the purchasers and decreed a cancellation of a $5,000 note and conditional sales contract.  The defendants appeal insisting by the assignments: (1) That the defendants-sellers made no false representations, (2) that representations as to the past earnings of the business were not material, (3) that complainants-purchasers had no right to rely upon the representations and did not rely thereon and (4) estoppel, laches and ratification growing out of the continued operation of the business by the purchasers.

A few days prior to July 21, 1947, defendants through a real estate agent with whom they had listed the business for sale furnished complainants a prospectus showing tangible assets of $8,013 and concluding with the following:

"For the past seven wks. average

| | |
|---|---|
| Gross | $767.43 |
| Expenses | $218.76 |
| Net | $558.67 |

"I added 7 wks. work as a Total 5,372.01 took ⅐ of this & got these Figures you understand work is off quite a lot these Summer Months."

4

On July 21, 1947 complainants deposited $200 with the agent and executed an offer to purchase at $10,000, to be paid $5,000 in cash and $5,000 by note. The conditional sales contract and note bear date of July 29, 1947. They were acknowledged and delivered on Friday, August 1, 1947, after complainant Frank B. Penick, Jr., a son-in-law of the complainant Ola Bevins and one of the purchasers, had spent four or five days at the plant largely for the purpose of learning dry cleaning methods. Mrs. Bevins had theretofore visited the plant on two occasions and had made a rather cursory examination of the records exhibited by defendants. We understand from her testimony that the records were in the possession of Mrs. Livesay who was the bookkeeper and that the portions pointed out tended to confirm the weekly earnings indicated by the prospectus.

After the contract was executed and delivered the defendants stayed at the plant through the following day, which was Saturday, August 2, 1947. While they were out to lunch Penick says he made an examination of the daily record book showing the volume of business for the preceding week and that he became suspicious that the volume was much less than he had been led to believe. However, he said nothing to defendants on their return but within a few days, possibly the following Monday, he began to insist upon being permitted to examine the other records which defendants had taken to their home on Saturday afternoon. He says that although his suspicions had been aroused he made no complaint on Saturday intending to make a thorough examination of the records and consult an attorney. When he examined the records on Saturday complainants had already invested $5,000 and executed a note for an additional $5,000.

Defendants, on one pretext or another, though frequently promising to do so, failed to comply with complainants' request for the records and within a few days complainants consulted an attorney who was visited at his office by defendants. When the attorney renewed the demand to see the books, he was advised by defendants that they had been burned. The present suit was filed September 8, 1947, approximately five weeks after the note was executed. In the bill complainants renewed their offer previously declined by defendants to turn the business back to them upon being reimbursed for the $5,000 invested in cash and the delivery of their title retained contract and note.

From the prospectus above quoted, the gross average weekly income over a period of seven weeks was $767.43 with a net of $558.67. For the five weeks between August 1, 1947 and the filing of the bill the gross receipts were (per week) $240.75, $277.51, $218.65 and $286.78. A number of employees who continued at the plant after complainants purchased testified that the volume immediately before and immediately after July 21, 1947, was practically the same. As we have seen, Penick testified that for the last week before it was taken over by complainants the records at the plant indicated that the receipts were far less than represented. Defendants introduced a ledger (not an original record) showing the net income, gross receipts and amount paid out for each week of the seven months of 1947 during which they operated the business. The prospectus, as we have seen, was based upon the last seven weeks before the plant was sold. Running back seven weeks from, but including July 12, 1947, it is to be seen from an examination of the book that the gross receipts and net earnings for the weeks

of June 14, 1947, and July 12, 1947, have been raised from $590 and 590.10, respectively, to $690 and 690.10 with a corresponding increase in the net earnings of $100 for each of these weeks. In view of the fact that the original records were burned by defendants, we think it fair to assume that these amounts have been purposely raised, since no explanation of these manifest alterations have been made by defendants. So assuming, and taking the book at its face value otherwise, it appears that the total earnings for the seven weeks in question were $4,600.40 or $607.20 per week. The average expense per week during that period was $241.81, leaving as the net average earnings $415.24 or $133.43 less than the net earnings indicated by the prospectus. Translated to a monthly basis this would have made a difference in earnings amounting to $433.73 per month. If we accept the income tax return made by defendants for the seven months the business was operated by them the business showed an average net profit for the twenty-seven weeks period of only $122.36 per week as against a represented net income of $548.67. In addition, the undisputed proof shows that the dry cleaning business is much better during the winter and spring months.

■ As the Chancellor commented, the burning of the records engenders doubt as to defendants' position and we believe enough has been said to indicate beyond serious dispute that the evidence of a fraudulent misrepresentation does not preponderate against the finding of the Chancellor on that question.

We cannot doubt that the representations as to the earnings of the business for the seven weeks period immediately before complainants purchased were a material and, in fact, the inducing factor. On the basis of these

supposed earnings, the purchase of the business appeared as an attractive investment. What the business had earned in the immediate past was some indication of what it would earn in the immediate future. Unless it could be made to earn a profit it had no value beyond what could be realized from the tangible equipment which could be expected to yield much less than the price demanded.

Complainants say they relied upon the representations made by defendants as to the profits. Did they have a right to rely on such representations? It is strenuously and ably argued that complainants lost any right they may have had to rely upon these misrepresentations because Penick was present at the plant for several days before the sale was consummated and Mrs. Bevins had inspected the records on two brief visits. Penick testified that he did not know anything about defendants' system of bookkeeping and did not become suspicious until after the note had been executed and the cash payment made. Mrs. Bevins testified that the records shown her by defendants tended to confirm the representations previously made as to gross and net income.

██ It is, of course, true that equity will not relieve against false representations in a case where both parties have equal knowledge of the matter misrepresented. ''Fraud involves deception and if one knows the truth, and is not deceived, he is not defrauded.'' Freeman v. Citizens' National Bank, 167 Tenn. 399, 70 S. W. 2d 25, 29.

██ In Hamilton v. Gilbraith, 15 Tenn. App. 158, it was said:

''The general principles applicable to cases of fraudulent representation are well settled. Fraud is never presumed; and where it is alleged the facts sustaining it

must be clearly made out. The representation must be in regard to a material fact, must be false and must be acted upon by the other party in ignorance of its falsity, and with a reasonable belief that it was true." See also Long v. Range, Tenn. App. 213 S. W. 2d 52, Opinion by Judge Howard.

In Shwab v. Walters, 147 Tenn. 638, 643, 251 S. W. 42, it was held that a statement of the financial condition of a corporation in which the complainant had purchased stock even though not absolutely known by the seller to be false, amounted to fraud if made without belief in its truthfulness or recklessly careless whether it was true or false, and that the buyer, even though he made some investigation of his own, could maintain an action for the fraud, it appearing that his purchase of the stock was greatly influenced by the statement.

The perpetrator of a fraud should not be relieved on the ground that his victim was negligent in believing the misrepresentation and should have made an investigation of his own.

"It has been frequently declared that as between the original parties, one who has intentionally deceived the other party to his prejudice is not to be heard to say, in defense of the charge of fraud, that the innocent party ought not to have trusted him or was guilty of negligence in so doing." 23 Am. Jur. 948.

In this case, until after complainants had parted with their money, all of the information they had concerning the earnings of the business came from defendants who justifiably might be assumed to have complete knowledge of all the facts necessary to determine the earnings. The prospectus purported to give the earnings down to the

last cent over a fixed period of time leaving the natural inference that the amounts indicated came from authentic records. Such representations were calculated to lull complainants into the belief that they were true and cause them to refrain from making a more extensive investigation. We think the Chancellor rightly held that defendants cannot escape the consequences of the misrepresentations on the grounds asserted.

██ ██ This leaves for consideration the final insistence that complainants lost the right to rescind by continuing to operate the business after discovery of the fraud.

Complainants requested rescission and offered to restore the property to defendants as soon as it developed that a complete investigation of the records would be impossible. Complainants renewed in the bill filed five weeks after the purchase of the business their offer, previously declined, to restore the property to defendants. The bill stands as a continuing offer and defendants' contest of the suit amounts to a continuing refusal to accept the offer. A substantial part of the purchase price represented the value of good will which would have been lost if complainants had not continued operating the business. We do not see that they have made any changes that are not incident to normal operations of the kind. Defendants will be the beneficiaries of complainants' losses incurred in keeping the business going during the time defendants have contested, as we find without justification, the right to rescind.

The requirement of equity that a purchaser seeking rescission on the ground of fraudulent misrepresentation must put the seller in status quo is an application of the principle that one seeking equity must first do equity. It should not be turned into a technicality to afford the

seller a means of escape from the consequences of his fraud. An offer to do equity by restoring the property, declined by the seller, in the absence of proof giving rise to the inference that the purchaser retains the property as his own, leaves the purchaser with the right of rescission unimpaired. Fairbanks, Morse & Co. v. Walker, 76 Kan. 903, 92 P. 1129, 17 L. R. A., N. S., 558; Southern Iron & Equipment Co. v. Bamberg, E. & W. R. Co., 151 S. C. 506, 149 S. E. 271; Land Finance Corp. v. Sherwin Electric Co., 102 Vt. 73, 146 A. 72, 75 A. L. R. 1025; O'Keefe v. Rontledge, 110 Mont. 138, 103 P. 2d 307, 148 A. L. R. 409.

"When the defrauded purchaser who had paid the purchase price elects to rescind and offers to return the property and place the parties in statu quo, such defrauded party is entitled to 'recover the entire consideration, which is the measure of damages on rescission.' Southern Brass & Iron Co. v. Exeter Mach. Works, 109 Tenn. 67, 74, 70 S. W. 614, 615." Simmons v. Evans, 185 Tenn. 282, 206 S. W. 2d 295, 297.

Both upon authority and principle we think the Chancellor correctly granted the relief sought by the bill and all assignments are accordingly overruled and the decree affirmed. Cost will be adjudged against defendants and sureties and the cause remanded.

Hale and Howard, JJ., concur.