MACHINERY SALES
COMPANY, INC.

v.

DIAMONDCUT FORESTRY
PRODUCTS, LLC, et
al.

Court of Appeals of Tennessee,
at Jackson.

May 22, 2002 Session.

July 18, 2002.

Permission to Appeal Denied by
Supreme Court Dec. 16, 2002.

Henry L. Klein, Memphis, for Appellant, Machinery Sales Company, Inc.

Glen Reid, Memphis, for Appellee, Champion International Corporation.

Dennis A. Cameron, Hot Springs, Arkansas, for Appellee, Diamondcut Forestry Products, LLC.

Thomas W. Hardin and Patrick M. Carter, Columbia, for Appellee, Columbia Trading, Inc.

W. FRANK CRAWFORD, P.J., W.S., delivered the opinion of the court, in which DAVID R. FARMER, J. and HOLLY KIRBY LILLARD, J., joined.

### OPINION

This is an action for rescission of a contract to purchase a chip mill. Purchaser sued seller and seller's alleged agent for rescission, based upon theory of fraudulent misrepresentation. Following a bench trial, the trial court entered judgment in favor of defendants. Plaintiff appeals. We affirm.

This action for rescission arises from a contract to purchase a chip mill.[1] Dennis Cameron ("Cameron"), owner of Defendant Diamondcut Forestry Products, LLC ("Diamondcut"), allegedly approached Richard Meadows ("Meadows") of plaintiff Machinery Sales Co., Inc.[2] ("Machinery Sales"), regarding the sale of a pulp and chip mill located in South Carolina. Meadows claims Cameron told him that the mill was owned and operated by Champion International Corporation ("Champion"), and that Bob Patterson ("Patterson"), President of Defendant Columbia Trading, Inc. ("Columbia") was Champion's authorized agent for the sale. During discovery, Meadows claims to have learned that Champion had actually entered into a contract to sell the chip mill to Patterson, although this deal was never consummated. Patterson allegedly did not tell Meadows of his contract with Champion, and testified that he did not "own" the mill at the time of his dealings with Meadows, since he had not made the final payments his contract with Champion required.

Meadows claims that Cameron advised him that he had a certified appraisal of the mill of over $7,000,000, which Patterson had prepared. Both Cameron and Meadows apparently understood that this appraisal applied to the mill as functioning and intact, and that selling the mill off piece-by-piece would net the parties considerably less money.

Following receipt of Patterson's appraisal, Meadows sent a copy to Jasper Jones ("Jones"), President of Delta Auction Company ("Delta"). Jones, a licensed auctioneer, had some knowledge of chip mills, although he had never auctioned a mill of this size. Jones then accompanied Meadows to South Carolina to determine if an auction sale of the mill was feasible. Jones advised Meadows that the mill was suitable for auction, and Meadows, with Cameron as his partner in the deal, entered into negotiations with Patterson and Champion for the purchase of the mill.

After some discussions, and after determining which items would be included in the sale, the parties came to an agreement. Meadows and Cameron agreed to pay $550,000 for the mill, with Cameron putting up $200,000 and Meadows paying the remaining $350,000. When Cameron sent Meadows a proposed contract, however, Meadows allegedly did not like the contract, and drafted a contract of his own. Meadows' contract provided that the parties would split the purchase price as described above, but that: (1) the first $365,000 of sales from the mill would go to Machinery Sales; (2) the second $200,000 of sales would go to Diamondcut; and (3) after expenses, any additional profits would be split 60–40 in favor of Machinery Sales. Finally, Meadows' contract provided that Delta Auction would conduct the sale of the mill for the parties. Both Meadows and Cameron signed the contract for their respective companies. Meadows borrowed $350,000 from his bank to cover his portion of the purchase price, while Cameron put up an assignment of a contract which was allegedly worth at least $200,000.[3]

Delta held the auction of the mill on February 15, 2000 in Newberry, South

---

1. A "chip mill" takes logs and reduces them to wood chips which are then sold for various uses.

2. Plaintiff is a corporation that buys and sells metal-working machinery in the Mid–South area.

3. Meadows claims that he was unaware that Cameron was putting up an assignment to cover his share of the purchase price in lieu of cash. It was not until the discovery phase of this action that Meadows says he became aware of the fact that Cameron had not invested cash in the deal.

Carolina. Response to the auction was, by Cameron's account, "dismal." Delta auctioned off approximately $9,000 in small hand tools, and only one bidder offered $250,000 for the entire mill. Meadows rejected the bid, and Delta terminated the auction.

On April 5, 2000, shortly after the auction, Meadows, for Machinery Sales, filed a Complaint for Rescission and Damages and Injunctive Relief against Diamondcut, Columbia Trading, and Champion. Meadows' claims are based upon "misrepresentations by the Defendants as to the value of the equipment purchased by Machinery Sales and misleading and false invoices submitted by Columbia." On September 28, 2000, Machinery Sales filed a Motion for Temporary Injunction, and, by agreement between Machinery Sales and Champion, the chip mill equipment remained in place pending the outcome of the trial.

The bench trial in this case was heard beginning on August 15, 2001, and concluded on August 17, 2001. At that time, the chancellor ruled in favor of all the Defendants. In his oral findings, the Chancellor stated the basis for his ruling as follows:

The plaintiff is seeking to rescind this contract, not based on the agreed to property being transferred, but on the basis that there was a misrepresentation by Mr. Cameron and by Mr. Patterson as to the value of the equipment to be transferred.

There is also a contention by Mr. Meadows that included in the purchase of this equipment was to have been the inclusion of some knives of which, apparently, did not or were not returned to the site as he had been led to believe they would be. . . .

The Court has to conclude that the items that were agreed to be purchased are those items that were included on the invoice that was mailed to Machin-

ery Sales to be forwarded, apparently, to the bank so that they would know exactly what all was being included.

Even if the knives were said to be thrown in as a part of the deal by Mr. Patterson, it does not appear that those items were, in fact, an integral part of their agreement to sell and to buy, but only those items that were included on the invoice, but other than that, the whole case is dependent upon an alleged misrepresentation as to the value on the property so conveyed.

\* \* \* \* \* \*

. . . [T]he problem that Mr. Meadows has is that he, in his mind, was misled as to the value because he had never dealt in this type of equipment, apparently, before and had no expertise in understanding whether the property had a certain value or not. So he pretty much relied on Mr. Patterson's appraisal . . . and he was led to believe that the estimate of value, as included in that appraisal, would be the approximate monies or somewhere thereabouts that this property could bring if it was sold at an auction.

But Mr. Patterson's appraisal is merely what it is. It is his opinion as to what the market value of this property is, not what it could bring in at auction, but I believe Mr. Reid indicated that you have a willing buyer and a willing seller, neither being under any compulsion to either buy or sell.

Mr. Patterson indicates that given his lifelong involvement in buying and selling these types of items and this kind of equipment that it was his considered opinion that the property is worth what he had appraised it and that he feels that were it not for the initiation of this lawsuit that he could probably get, substantially, more in selling these parts or

whatever than an auction would bring, but, nevertheless, the appraisal is his estimate, his assessment, of what the property was worth.

The Court cannot find that his appraisal constitutes any misrepresentation, especially where the Plaintiff saw and had his representatives come out to the property and see for themselves the property as appraised.

At no time did it appear that Mr. Jones or Mr. [Taggert], who Mr. Meadows was relying upon to confirm whether this was a good deal or not—at no time did they express any reservations that the property was worth less or could bring much less than Mr. Meadows or anybody had anticipated. They would have been, presumably, Mr. Meadows' representatives and his independent assessors as to the value of this property, but Mr. Jones indicated that he was not an appraiser, and Mr. [Taggert] indicated that, although he was an appraiser, he did not give any value to the item[s].

Both Mr. Jones and Mr. [Taggert] were of the opinion that notwithstanding their inability to value the subject property, they felt that an auction of this property would bring an amount where they could receive a substantial commission.

Mr. Patterson, in this Court's opinion, gave this Court a better idea of what this whole transaction was about and how it came about. Mr. Patterson was the person who either owned or had the right to convey title and ownership to this property from Champion. True enough, Champion was the owner of the property, but, apparently, they had assigned and/or conveyed to Mr. Patterson the right to sell the property.

Whether he was their agent or whether they had conditionally conveyed him the interest to sell is not that significant in this Court's opinion, especially where Mr. Chu, on behalf of Champion, indicated in the letter to Mr. Meadows that Mr. Patterson with Columbia Trading had the authority to transfer a title, and the arrangement between Champion and Columbia Trading, in this Court's opinion, was not the business of Mr. Meadows and Mr. Cameron.

All they knew or had the right to know was that Mr. Patterson and Columbia Trading had the right to convey to them title, and that's what Mr. Chu's letter ... said ... because Mr. Meadows was concerned about who actually owned the property, Mr. Chu sent the confirmation letter reaffirming that Mr. Patterson and Columbia Trading had this authority.

Well, Mr. Klein, very ably though, argues that Mr. Cameron didn't put up any money, that the assignment was worthless. Well, the Court does not agree with that assessment. Mr. Meadows knew and Mr. Cameron knew that Mr. Patterson was asking for $550,000 for these properties, and it does not appear through the evidence that there was any side deal between Mr. Patterson and Mr. Cameron to reduce the sales price.

... Mr. Cameron apparently felt that he had an asset worth $200,000 that he could put up as his contribution against the $550,000 sales price, and in this Court's opinion, if Mr. Patterson and Columbia Trading deemed that to be worth $200,000, then that would be a sufficient payment towards the $550,000 purchase price.

When Mr. Meadows elected to put up cash—and I don't know anywhere in here where it says that he had to put up cash, but it's assumed that all parties assumed that he would get the money

from the bank, but I don't see anything in the documents that says it can't be in diamonds, it can't be in real estate ...

* * * * * *

It was only after the auction did not bring what Mr. Meadows thought it would bring or what they were led to believe that Mr. Patterson could get for it ... but Mr. Patterson ... indicated that the values he put on any of these properties would ... [be] only what he, if he had to sell it, could get for it.

The Court cannot find any misrepresentation on anyone's part. The letter from Mr. Chu—there is nothing that has been presented here today that anything in that letter was not correct.

The agreement between Mr. Cameron and Mr. Meadows—the Court cannot find that Mr. Cameron made any misrepresentation. He gave up an asset valuable to him for $200,000 to Mr. Patterson, and that, apparently, was sufficient for Mr. Patterson to show a balance owning of only $350,000.

... [T]o rescind a contract is an extraordinary remedy. It's an equitable remedy in which a party is seeking to be relieved of his obligation under a contract on the grounds of either mutual mistake, fraud or impossibility of performance.

There is no mistake as to the property that was to be purchased. It was purchased. There is no mistake as to the amount of the purchase price. It was $550,000. Everybody performed. The $550,000 was paid or considered credit. The title for all practical purposes has been turned over to Machinery Sales and Diamondcut. Machinery Sales assumed ownership or part ownership of the property by having their representative, Delta Auction, sell off some of the property, and though some of the money went to Delta Auction for its expenses,

nevertheless, it was [at] the behest and on behalf of the plaintiff, Machinery Sales.

It appears that there is no mutual mistake. There may have been a mistake on the part of Mr. Meadows as to the value of the property after the bids from the auction were much less than he had anticipated, but there is no mistake on the part of any of the defendants as to what was agreed to.

The Court doesn't find any fraud that exists in this case. The contract has been performed, and for all those reasons, the court feels that a judgment should be entered for all defendants and the cause dismissed with cost assessed against the plaintiff.

Judgment was entered for all defendants. Machinery Sales appeals, and presents the following issues for our review: (1) Whether Plaintiff was fraudulently induced to enter into a contract with Defendant to purchase the chip mill; (2) Whether the acts of Patterson and Columbia Trading, Inc., acting as agent, are imputed to the principal, Champion International Corporation; (3) Whether Plaintiff is entitled to rescission of the contract for purchase of the chip mill; (4) Whether Plaintiff is entitled to recover the purchase price of the mill, together with compensatory and punitive damages and pre and post-judgment interest; and (5) Whether the trial court erred in its findings of fact and conclusions of law. For the following reasons, we affirm the judgment of the trial court in its entirety.

Since this case was tried by the court sitting without a jury, we review the case *de novo* upon the record with a presumption of correctness of the findings of fact by the trial court. Unless the evidence preponderates against the findings, we must affirm, absent error of law. *See* Tenn. R.App. P. 13(d).

The trial court's ruling in this matter was based entirely upon evidence presented at trial and the testimony of witnesses for both sides. When the resolution of the issues in a case depends upon the truthfulness of witnesses, the trial judge, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *See McCaleb v. Saturn Corp.*, 910 S.W.2d 412, 415 (Tenn. Special Workers' Comp.App. Panel 1995); *Whitaker v. Whitaker*, 957 S.W.2d 834, 837 (Tenn.Ct.App.1997). The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court. *See id., In re Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn.1997).

■ Since the basis for Plaintiff's Complaint for Rescission in this case is the allegation that Defendants fraudulently induced Plaintiff to enter into the sales contract, the determinative issue in this case is whether Plaintiff Machinery Sales proved its case of fraud. We, therefore, begin our analysis with a discussion of the law in Tennessee concerning fraudulent misrepresentation.

In *Bevins v. Livesay*, 32 Tenn.App. 1, 221 S.W.2d 106 (1949), this Court, quoting *Hamilton v. Galbraith*, 15 Tenn.App. 158, noted:

> The general principles applicable to cases of fraudulent representation are well settled. Fraud is never presumed; and where it is alleged the facts sustaining it must be clearly made out. The representation must be in regard to material fact, must be false and must be acted upon by the other party in ignorance of its falsity, and with a reasonable belief that it was true. *See also Long v. Range*, [31] Tenn.App. [176], 213

S.W.2d 52 [1948] opinion by Judge Howard.

*Id.* at 109. *See also Hiller v. Hailey* 915 S.W.2d 800, 803 (Tenn.Ct.App.1995). Similarly, this Court has said:

> Generally in an action for fraud, there must be proof of a false representation of an existing or past material fact. The false representation must have been made knowingly without belief in its truth or recklessly. Some person must have reasonably relied on it and suffered some damage as a result of the reliance. *Pusser v. Gordon*, 684 S.W.2d 639 (Tenn.Ct.App.1984). Fraud involves deception and if one knows the truth, and is not deceived, he is not defrauded. *Freeman v. Citizens' Nat'l Bank*, 167 Tenn. 399, 70 S.W.2d 25 (1934).

*Maddux v. Cargill, Inc.*, 777 S.W.2d 687, 691–92 (Tenn.Ct.App.1989).

We believe that, under this record, although the alleged misrepresentations involved facts material to the contract to purchase the chip mill, the trial court correctly found that Machinery Sales failed to produce evidence that the misrepresentations, if any, were knowingly made, or that Meadows reasonably relied upon those alleged misrepresentations in entering into the contract.

As to Meadows' contention that Patterson, acting on behalf of Champion, misrepresented the overall value of the mill, the trial court found that Patterson's appraisal was "his opinion of what the market value of the property was." Meadows' testimony at trial indicates that he was aware that Patterson's appraisal represented Patterson's opinion of the value of the mill sold as a working whole, and that Meadows, in determining what the property might garner in an auction, discounted the value of the mill accordingly.

Although counsel for Machinery Sales argues that Patterson made an additional "piece-by-piece" appraisal of the property while Meadows was in South Carolina for an inspection, the trial court found that Meadows did not reasonably rely upon this informal appraisal. The record indicates that Meadows had two representatives of Delta Auction tour the facility with him. Meadows argues that the Delta representatives did not view the facility in order to make an appraisal, but the Chancellor found that the representatives believed that auctioning the property would bring "an amount where they could receive a substantial commission." The record also indicates that Meadows made no attempts to seek other appraisals of the property, or to seek advice from parties not involved in the transaction, in spite of the fact that Meadows was an experienced businessman.

The Chancellor also found that the facts did not support Meadows' claim that Cameron, as Meadows' partner in the deal, defrauded him by putting up a contract assignment rather than $200,000 cash to purchase the mill. Although Meadows called the assignment "worthless," we agree with the Chancellor that "if Mr. Patterson and Columbia Trading deemed [the assignment] to be worth $200,000, then that would be a sufficient payment towards the $550,000 purchase price." The record does not indicate, and the Chancellor did not find, that any agreement between Meadows and Cameron regarding payment of the purchase price required that payment be in cash.

■ Meadows and Machinery Sales also argued that the Defendants misrepresented the items which were to be included in the final sales price. Specifically, Meadows claimed that $100,000 worth of spare chipper knives which had been moved to another location were supposed to have been returned to the chip mill site as part of the auction sale. The knives were never returned to the mill.

In his ruling, the Chancellor found that these knives were not part of the contract for purchase, because they were not listed on the itemized invoice Meadows required before he would pay his $350,000 share of the purchase price. On cross-examination, Meadows admitted that he had not pursued the matter of the spare chipper knives with Champion's representatives, and dismissed the $100,000 knives as "accessories" for the chipper itself:

Q: And they were not revealed on the invoice, the itemized invoice that you demanded upon which you paid the $350,000?

A: Well, you've got to remember there was a bunch of odds and ends that went with this chip mill that were not itemized invoices that were accessories. These chipper knives are accessories for the chipper itself.

Q: As I understand your testimony, you understood the chipper knives would be worth over $100,000, which is some 20 percent of what you paid for the entire—little less than 20 percent. Do you consider that some type of accessory that doesn't need to be itemized?

Based upon our *de novo* review of the record in this case, we hold that the evidence does not preponderate against the trial court's findings that Defendants did not fraudulently induce Machinery Sales to enter into the contract for purchase of the chip mill. We, therefore, affirm the Chancellor's judgment in favor of the Defendants. Since we hold that Machinery Sales failed to prove fraud on the part of the Defendants, we pretermit the Plaintiff's issue regarding an agency relationship between Patterson and Columbia.

For the foregoing reasons, we affirm the order of the trial court granting judgment in favor of Defendants. This case is remanded to the trial court for any further proceedings consistent with this opinion. Costs of this appeal are assessed to the Plaintiff/Appellant, Machinery Sales Company, Inc., and its sureties.