IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
July 12, 2005 Session

## CONSUMER FINANCIAL SERVICES (MANAGEMENT), INC., G. RONALD HALL, and JACQUELENE O'ROURKE HALL v. CONSUMER FINANCIAL SERVICES MANAGEMENT, L.L.C., and GABRIEL, L.L.C..

**An Appeal from the Chancery Court for Williamson County**
**No. 26675     R. E. Lee Davies, Chancellor**

———————————

**No. M2003-02030-COA-R3-CV - Filed December 9, 2005**

———————————

This is a contract action. The sellers sold to the purchasers a loan company dealing in sub-prime residential loans and mortgages and third-party finances, as well as equity interests in a related limited liability company. After closing the transaction, numerous financial and operational problems became apparent. The purchasers attempted to rescind the transaction, as the business foundered. Eventually, the sellers took back the business and sued the purchasers for breach of contract. The purchasers filed a counter-complaint, alleging that the sellers fraudulently induced the contract through multiple oral and written misrepresentations. After a bench trial, the trial court found that the sellers had committed fraud in inducing the contract. The purchasers were granted rescission of the sale agreement, as well as compensatory damages. The trial court dismissed the sellers' breach of contract complaint. The sellers appealed. We affirm.

**Rule 3 Appeal; Judgment of the Chancery Court is affirmed.**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which W. FRANK CRAWFORD, P.J., W.S., and DAVID R. FARMER, J., joined.

John R. Reynolds, Nashville, and Mark E. Ellmore, Nashville, for Appellants Consumer Financial Services (Management), Inc., G. Ronald Hall, and Jacquelene O'Rourke Hall.

Mary A. Parker, Nashville, for Appellees Consumer Financial Services Management, L.L.C., and Gabriel, L.L.C..

# OPINION

This case involves the sale of business assets and equity interests. Due to the complexity of the intertwined corporate structures and business interests, we will first identify the parties and interests involved, and then discuss the events leading up to this litigation.

Plaintiff/Appellants Ronald and Jacquelene Hall were officers, shareholders, and members of the Board of Directors of Plaintiff/Appellant Consumer Financial Services (Management), Inc. ("CFSM, Inc."). CFSM, Inc. was a Tennessee corporation with its principal place of business located in Marshall County, Tennessee. The company was licensed as an industrial loan company, and acted primarily as a broker for sub-prime loans and third-party finances. CFSM, Inc.'s business centered around originating and brokering residential loans and mortgages. Its loans and mortgages were funded through a warehouse line of credit, which enables companies to buy and sell loans in bulk. Typically, once the mortgages and loans were sold by CFSM, Inc. to third parties, CFSM, Inc. would then use the proceeds of the sale to pay on the warehouse line of credit.

The Defendants in this case were comprised of several individuals and the business entities set forth below. As discussed *infra*, the business transactions between the Plaintiffs and the Defendants resulted in the formation of Defendant/Appellee Consumer Financial Services, Management, L.L.C. ("CFSM, L.L.C."). CFSM, L.L.C. was a Tennessee limited liability company, with its principal offices located in Williamson County, Tennessee.

Defendant/Appellee Gabriel, L.L.C. ("Gabriel") was a Tennessee limited liability corporation. Gabriel and Plaintiffs Ronald and Jacquelene Hall were the members and owners of CFSM, L.L.C. Defendant Sandra Ray acted as the general manager of CFSM, L.L.C. and also as the general manager of Gabriel. Sandra Ray and Defendant Kevin Gardner were both members of Gabriel.

Consumer Mortgage Company ("CMC") was also named as a defendant in this suit. CMC was a Tennessee corporation licensed by the State as a mortgage banker. Gabriel and the Halls were shareholders of CMC; the Halls maintained a minority interest. Defendant Kevin Gardner, a member of Gabriel, was the chief operating officer of CMC.

These somewhat convoluted business relationships were largely the result of the business dealings of Defendant Sandra Ray with the Plaintiff Halls. Ray was introduced to the Halls by a business associate who was, at one point, a potential purchaser of CFSM, Inc. and CMC. Ray shared the business associate's interest in purchasing those companies. The business associate eventually dropped out.

In the meantime, when the Halls became interested in selling their business, they spoke with a company called the March Group, which sought to work on the Halls' behalf to sell the Halls' business. In order to market their services, the March Group performed a valuation of the Halls' business, essentially to give the Halls an estimate of the selling price the March Group believed it

could obtain. The valuation was not a formal appraisal; it was done for the Halls' benefit only, with unaudited information obtained from the Halls and not independently verified by the March Group. The report, referred to as the March Report, was issued, coincidentally, in March of 1998. Among other things, the March Report indicated a pretax 1997 income for the Halls' business of approximately $312,000.

At about the same time, March 1998, Ray and the Halls entered into negotiations for Ray to purchase the Halls' businesses, CFSM, Inc. and CMC. During the course of the negotiations, despite the fact that the March Report was done only for the purpose of persuading the Halls to use the services of the March Group in selling their business, the Halls gave the March Report to Ray. The March Report given to Ray included the $312,000 income figure for 1997. In the following months, Ray engaged in "due diligence," that is, investigation of the businesses for the purpose of purchasing them.

During this time period, the Halls filed the 1997 income tax return for their business. It showed that the income for the year 1997 was a negative $125,000. Ray, who had been given the March Report indicating an estimated income for 1997 of $312,000, did not obtain a copy of the 1997 tax return.

Eventually, in the course of the negotiations, the parties entered into a quiet period for normal business operations from late July 1998, to the closing of the transaction, set for September 11, 1998. The negotiations resulted in two contracts to be executed at closing: an Asset Sale Agreement and a Stock/L.L.C. Interest Purchase Agreement.

The Asset Sale Agreement was entered into at the September 11, 1998 closing. The parties to the Asset Sale Agreement were CFSM, Inc. and the newly-formed CFSM, L.L.C. Pursuant to the Asset Sale Agreement, CFSM, Inc. conveyed all of its assets, including the loans on the warehouse line and its mortgages, to CFSM, L.L.C. The mortgages were funded and closed, but remained unsold. The purpose of the Asset Sale Agreement was to sell CFSM, Inc. to Ray and Gabriel. By virtue of the Asset Sale Agreement, CFSM, L.L.C. assumed CFSM, Inc.'s debts.

Consideration for the Asset Sale Agreement included a $252,500 payment. Part of this payment was due in cash at the closing, with the remainder subject to a promissory note to be paid on January 4, 1999. The promissory note, in the amount of $134,408.28, was secured by all assets, both tangible and intangible, including cash, accounts, trade fixtures, tools, machinery, computers, software, proprietary software, equipment, and any resulting proceeds from the acquisition of equipment. Plaintiff Ronald Hall signed the Asset Sale Agreement in his capacity as both chief manager of CFSM, L.L.C. and as president of CFSM, Inc.

The Stock/L.L.C. Interest Purchase Agreement ("Stock Agreement") was also entered into at the September 11, 1998 closing, contemporaneously with the Asset Sale Agreement. The Stock Agreement transferred the Halls' majority ownership interests in CMC and Defendant CFSM, L.L.C. to Gabriel. As a result of the transaction, Gabriel owned 90% of the stock in those two

companies and the Halls retained a 10% interest. As consideration for the sale, the Halls received $299,408.28 in cash at closing for 54% of their ownership interests, and were owed an additional $206,591.72 as payment for the remaining 36% of the Halls' ownership interests. Pursuant to Exhibit C of the Stock Agreement, Gabriel also agreed to assume certain debts and obligations belonging to the Halls.

In addition, the Stock Agreement contained a non-compete covenant which provided that the Halls would not compete with CMC or CFSM, L.L.C. by operating a mortgage company that warehouses loans for a period of ten years following the agreement. In consideration for the non-compete clause, the Halls were to be paid $750,000 in installments over the ten year period.

Shortly after the September 11, 1998 closing, Sandra Ray, Gabriel's chief manager, took over operation of CFSM, L.L.C. Ray soon discovered that the financial and operational condition of CFSM, Inc. and CMC was not as it had appeared during the negotiations. On the first day after the takeover, numerous fiscal and operational problems became apparent. This led Ray to question the veracity of the representations made to her during the negotiations, as well as the overall financial health of the companies. On October 10, 1998, less than a month after the closing, Ray sent a letter to the Halls indicating her desire to rescind the contracts. It is unclear how the Halls responded to this letter; nevertheless, Ray remained on as the chief executive officer and tried to make the best of a less-than-desirable situation.

In light of the previously undisclosed financial difficulties, within the first few months following the September 11, 1998 closing, the parties executed various revisions to the purchase agreements, altering the terms of those agreements. These amendments included, among other things, a reduction of the payment for the non-compete, from $750,000 payable over ten years to $525,000 payable over eight years. The businesses continued to have considerable difficulties.

Finally, on November 3, 1999, the Halls reentered the offices of CFSM, L.L.C., changed the locks on the doors, and refused to give Ray a key. Later that afternoon, Ray submitted her resignation as chief manager of CFSM, L.L.C.

After retaking control of the company on December 1, 1999, the Plaintiffs, CFSM, Inc., Ronald Hall, and Jacquelene Hall filed a lawsuit against the Defendants, including Ray, in the Chancery Court for Williamson County. The complaint sounded in contract, alleging multiple breaches of the Asset Sale Agreement and the Stock Agreement. The Plaintiffs sought damages in excess of $450,000.

In response, on March 2, 2000, the Defendants filed an answer and counter-complaint. Defendants Gabriel and Ray filed their counter-complaint against CFSM, Inc. and the Halls, alleging that, prior to the sale, the Halls made numerous misrepresentations to Ray regarding the operations and fiscal status of CFSM, Inc. and CMC. The counter-claim asserted that, prior to the closing in September 1998, the Halls failed to disclose more than $200,000 in liabilities related to the status of certain loans and projects on the warehouse line of credit. The Defendants averred that, in

reliance on other misrepresentations, Gabriel executed the Stock Agreement. Furthermore, the Defendants alleged that the Halls breached the Stock Agreement by (1) falsely representing that the financial statements provided to the Defendants accurately reflected the financial position of the business, (2) providing inaccurate inventories, (3) falsely representing that the corporations were in good standing with customers and suppliers of the business, and (4) falsely representing that there were no defaults under any agreements.

The Defendants also alleged numerous misrepresentations in connection with the Asset Purchase Agreement. According to Defendants, the false representations by the Halls included (1) valuation of CFSM, Inc. at over $400,000 more than it was worth, (2) representations that CFSM, Inc. had a good relationship with customers and suppliers, and (3) representations that CFSM, Inc. was in compliance with all laws and not in default under any agreements.

The Defendants' counter-claim further asserted that the Halls represented to Gabriel and Ray that the business was running so well that they would avoid the operational difficulties of a start-up business and be able to focus on innovation and business improvement. The Defendants alleged that this did not turn out to be the case. The Defendants asserted that they found a number of serious operational deficiencies and that the Plaintiffs had engaged in significant omissions and false representations including, but not limited to, (1) the existence of suspended licenses and inadequate insurance, (2) the absence of summaries for equipment leases, (3) incomplete loans on the warehouse line of credit that could not be sold, (4) loans on the warehouse line of credit that were in default, (5) incomplete and inaccurate employee records, (6) the use of improper accounting methods, and (7) undisclosed litigation.

The Defendants sought damages for misrepresentation, breach of contract, breach of warranties, and also sought indemnification in an amount approaching $500,000. In the alternative, the Defendants sought rescission of the Asset Sale Agreement and the Stock Agreement, as well as a money judgment for all amounts paid to the Halls and CFSM, Inc. and for all losses suffered as a result of the Defendants' operation of the business. Finally, the Defendants asked the trial court to declare the agreements void and unenforceable due to misrepresentations, fraud, and the failure of conditions precedent.

The Plaintiffs responded to the counter-claim by denying any false representations in either the Asset Sale Agreement or the Stock Agreement, denying any oral misrepresentations, denying locking the Defendants out of the business, and denying the existence of any material business problems requiring correction.

A bench trial was held on April 23 and 24, 2003, in the Chancery Court for Williamson County. The testimony pertinent to this appeal centered on Ray's access to reliable information about the business, the Halls' representations to Ray regarding the value of the business, Ray's reliance on those representations, and the condition of the company's operations at the time Ray and Gabriel assumed control.

At trial, there was considerable testimony regarding Sandra Ray's due diligence efforts to learn about CFSM, Inc., and specifically regarding Ray's freedom of access to the company's physical premises, the company's records, and the company's employees. Ronald Hall testified that, at one point during the negotiations, Ray had unfettered access to CFSM, Inc.'s premises. In fact, he testified, Ray's presence was sufficiently conspicuous to make the employees nervous about whether the company was about to be sold. Other testimony, however, indicated that Ronald Hall had, on numerous occasions, instructed Ray and other potential buyers to stay away from the business so as not to interfere with operations. For instance, Lyndon Bates, an investor and officer in Gabriel, testified that Ronald Hall ordered Bates to stay away from the company and to refrain from talking to any employees during the due diligence period. As a consequence, Bates said, he relied on Ray to perform the due diligence.

Sandra Ray's testimony on her access to information sharply contrasted with testimony of Ronald Hall. Between July and September of 1998, Ray had access to the company. She testified that the parameters of her access were well defined. Ray had no direct access to employees or to the company's files. When she wanted to review a file, she would request the document from the Halls, and she relied upon the Halls to pull the document and deliver it to her. During this due diligence period, Ray requested transaction reports, budgets, tax returns, leases, and various other pertinent contracts and business documents. On a number of occasions, Ray requested a report on aged payables. She emphasized the importance of a report of aged payables, because the absence of aged payables indicates that the company is current in its obligations. Ray asserted that she never received an aged payables report, and testified that Jacquelene Hall told her that everything was paid and current and therefore there were no aged payables.

In his testimony, on cross examination, Ronald Hall admitted to telling the purchasers that the company was making between $200,000 and $300,000, based on tax information. Mr. Hall represented to Lyndon Bates that the company was profitable, and pointed to the March Report's estimate of $312,000 in income for 1997 as evidence of that profitability. The letters of intent circulated between the parties also indicated an understanding that the net income of the company for 1997 was approximately $312,000, as set forth in the March Report.

The trial court also heard testimony from Jeff Dunkle, the financial analyst for the March Group, responsible for performing the analysis for the Halls. Dunkle testified that the March Group relied only on the Halls' representations about the background history of the business and the potential performance of the business. The March Group believed the Halls' representations to be reliable, and did not assume responsibility for verifying the accuracy of the statements. Dunkle indicated that the March Group did not intend for the report to be used as a formal appraisal.

Dunkle explained that the March Group utilizes business valuations like the March Report as a marketing tool to induce a potential customer, such as the Halls, to employ the March Group for marketing services. He said that the purpose of the report was to provide the Halls with a business valuation to inform them of the amount that the March Group thought it could obtain for the company if the Halls chose to sell it. The March Report stated that it was not to be copied or

used for any purpose other than the marketing endeavor. According to Dunkle, the March Report was not intended to be used by a business owner for the purpose of selling his or her own business.

In compiling the March Report, Dunkle testified the March Group did not rely on audited financial information; because he was not furnished the tax information for 1997, the March Report's conclusions did not reflect that information. Based on his evaluation, Dunkle initially estimated that the entity's earnings before interest and taxes were approximately $174,000. Dunkle testified that, had he been furnished with audited financial information, including the 1997 tax information, his estimate of the 1997 pretax income of the companies would have been much lower--instead of the $174,000 in income he initially estimated, the March Report would have reflected a net loss in 1997 of $124,952. Dunkle acknowledged that ultimately, the March Report indicated an estimated net income for 1997 of $312,116, rather than the initial estimate of $174,000. Dunkle explained that the Halls insisted that the number be revised to reflect a higher income figure, and Dunkle speculated that the amount was revised upward by removing the owners' compensation and reducing administrative expenses from the equation.

Apparently two versions of the March Report were generated; both versions were introduced into evidence at trial. One version was noticeably thicker than the other. Ray testified that she received the thinner version prior to closing the sale, and did not receive the thicker version until one month before the trial. The thicker version contained an assumptions section not included in the thinner version; the assumptions section explained the assumptions upon which the valuation was based.

The March Report indicated, in some places, that the income analysis for 1997 was merely a forecast. On other pages, however, the 1997 numbers were not noted to be forecasts. A page entitled "Financial History and Economic Adjustments" provided a "historic income statement comparison," and directly compared the revenue, expenses, and net income for the years 1994, 1995, 1996, and 1997, without noting that the 1997 figure was a forecast. The page showed that the net income for 1997 was $312,116, while listing the net income for the previous three years as $102,039, $43,738, and $24,448 respectively. Ray testified that, when she asked the Halls about the company's dramatic 1997 improvement, the Halls explained that the growth in 1997 was simply the fruit of their labor. However, Jeff Dunkle testified that two months prior to the closing date, the Halls filed their 1997 income tax for CFSM, Inc., and, at that point, knew that the actual income for 1997 for the company was a negative $124,952, and not the $312,116 figure that was reflected in the letters of intent, the negotiations, and the March Report.

Ray, as well as her business associates, testified that they relied heavily on the representation in the March Report and the representations by the Halls regarding the company's income, and that they would not have invested money in the venture were it not for those representations. Ray admitted during cross examination that prior to the purchase, she did not do as much as she could have to educate herself about the business. For instance, she did not seek expert input on the business' value, did not attempt to obtain independently-verified audited financial information, and did not seek outside counsel for an unbiased examination of the warehouse line of credit. She

admittedly failed to obtain a copy of the company's 1997 tax return prior to closing. She said that she asked for the 1997 return and the Halls said they did not have it.

Ray testified that, after the transaction closed and she and Gabriel assumed control of the companies, she learned that the company had an approximate bank balance of negative $4,800. Ray said that creditors were constantly calling, wanting to be paid, and there were outstanding liabilities about which the purchasers had no knowledge, because they were not on the Exhibit C attachment to the purchase agreement. Moreover, the list of leases attached to the purchase agreement was incorrect. One day after the closing, the Defendants learned that one loan had been placed in bankruptcy and that several others were deficient. Additionally, the Defendants maintained, the list of accounts payable provided by the Halls to the purchasers was not accurate, and the office equipment was not operational.

Lyndon Bates and Sandra Ray also testified that the Halls did not disclose ongoing litigation by the Halls and CFSM, Inc. against SunTrust Bank. Ronald Hall disputed whether Bates and Ray had knowledge of the suit. He claimed that Bates and Ray chose to remain uninvolved in the suit because they did not want to sour their ongoing relationship with SunTrust.

After hearing the testimony, the trial court entered an order dated May 28, 2003. The trial court found that the material issues in the sale of the businesses included the income stream to the prior owners and the value of the companies sold. The court noted that the Halls commissioned the March Group to compile the March Report, and the March Report was based solely on information provided by the Halls. It found that the version of the March Report received by Sandra Ray and Lyndon Bates was incomplete in that it did not contain the provisions, included in the thicker version, stating that the report was an estimate only. It observed that the most important factor in the March Report for the purpose of valuing the company was income, and the income figure for the year 1997 was given the most weight. The trial court found that the March Report's projected income for 1997 of $312,116 had been revised upwards on the instruction of Mr. Hall from the initial estimated figure of $174,000. However, in July 1998, the Halls filed the corporation's 1997 tax returns, which reflected a negative income of $125,000. The trial court held that the approximately $400,000 discrepancy between the 1997 income of the company as represented and the actual income of the company placed a duty on the sellers to disclose to the purchasers the actual income figures for 1997. The1997 income figure of $312,116 was reflected in the March Report, the letters of intent between the sellers and the purchasers, and in oral representations by Mr. Hall to the purchasers, and the trial court found that this was a material issue in the sale. Additionally, the trial court found that there were misrepresentations in Exhibit C to the original contract regarding the number and amount of payables owed by the businesses; the trial court concluded that the payables turned out to be much greater than what was represented to the purchasers. Finally, the trial court found that the existing loans in the warehouse line were in violation of the warehouse agreement that required no more than forty-five days for closing the loans, and that this was a material fact not disclosed to the purchasers prior to the closing of the transaction.

Based upon these findings, the trial court concluded that the Halls committed fraud which induced the Defendants to enter into the purchase agreement. Based upon its finding of fraud, the trial court dismissed the Plaintiffs' complaint against the Defendants, and held that rescission was an appropriate remedy in the case. The court then awarded damages in the amount of $390,231.28 to the Defendants/Counter-Plaintiff, Gabriel, against the Halls. The damage award was broken down as follows: $320,408.84 for actual contract payments to the Halls for the businesses; $61,775.00 for payments to the Halls on the noncompete agreement; $3,600.00 for payments under the contract to First Farmers Bank, which the Halls were required to make and were ultimately assumed by Gabriel; and, $4,448.00 representing an automobile lease. From this judgment, the Halls and CFSM, Inc. now appeal.

On appeal, the Halls and CFSM, Inc. (collectively, "Appellants") raise numerous issues. The Appellants argue that the trial court erred in dismissing their complaint, erred in finding fraudulent inducement of the September 11, 1998 contract, erred in finding that the Halls' failure to disclose the 1997 tax returns was fraudulent, erred in ruling that rescission was an appropriate remedy in this case, and erred in calculating damages. The Appellants also contend that the trial judge violated their due process rights by failing to recuse himself from the case. The Appellants additionally argue that the trial court erred by dismissing their complaint, finding that they fraudulently induced the contract, and finding that they fraudulently failed to disclose the 1997 corporate income tax returns to the Defendants.

On appeal, the trial court's findings of fact are reviewed *de novo* upon the record with a presumption of correctness, unless the evidence preponderates otherwise. *See* Tenn. R. App. P. 13(d). The trial court's legal conclusions, however, are reviewed *de novo*, with no presumption of correctness. ***In re C.K.G.***, 173 S.W.3d 714, 721 (Tenn. 2005).

To establish a claim of fraudulent inducement of a contract, the claimant must prove a false representation of a material fact, that the false representation was made knowingly, that the complainant reasonably relied on that representation, and that the complainant suffered damage as a result of that reliance. ***Mach. Sales Co., Inc. v. Diamondcut Forestry Prods, LLC,*** 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002) (citing ***Maddux v. Cargill, Inc.,*** 777 S.W.2d 687, 691-92 (Tenn. Ct. App. 1989)); *see also* ***Burton v. Hardwood Pallets, Inc.,*** 2004 WL 572350, *2 (Tenn. Ct. App. March 22, 2004). The burden of proving each element lies with the complainant. ***Mach. Sales Co.,*** 102 S.W.3d at 643. Ultimately, the credibility determinations of the trial judge are entitled to significant weight upon review. ***Id.*** (citing ***In re Estate of Walton v. Young,*** 950 S.W.2d 956, 959 (Tenn. 1997); ***Whitaker v. Whitaker,*** 957 S.W.2d 834, 837 (Tenn. Ct. App. 1997)). This deference is due, in large part, to the fact that the trial judge has the opportunity to observe the manner and demeanor of witnesses as they testify. ***Id.*** (citing ***McCaleb v. Saturn Corp.,*** 910 S.W.2d 412, 415 (Tenn. Special Workers' Comp. App. Panel 1995)).

In the instant case, the Appellants assert that the Defendants failed to produce any evidence of fraudulent statements or reliance. They liken the Halls' representations to little more than statements of opinion, intent, or sales puffing.

Our review of the trial evidence compels a contrary conclusion. The evidence at trial established a multitude of misrepresentations and omissions made by the Halls to the Defendants. Taken together, the oral representations, the March Report, Exhibit C to the agreement, and the letters of intent are ample support for the trial court's finding of a false representation of the financial status of the business sufficient to substantially affect the valuation of the business. The evidence clearly preponderates in favor of a finding that the Halls had knowledge of the falsity of those representations. For instance, the 1997 tax returns, filed in July 1998, were sufficient to show that the Halls were aware that their representations regarding the 1997 income were incorrect. The Defendants submitted significant evidence, particularly through their testimony, that they in fact relied on the Halls' representations regarding the value of the companies and the efficiency of their operations. There was substantial evidence as well that the Defendants incurred significant damages directly resulting from their reliance on the Halls' misrepresentations and omissions.

More troubling is the analysis of the duty of the Halls and CFSM, Inc. to disclose the 1997 corporate tax return information to the Defendants prior to closing. The Appellants cite *Domestic Sewing Mach. v. Jackson*, 83 Tenn. 418 (1885), for the proposition that they had no duty to disclose the financial information to the Defendants in an arm's-length transaction. However, the Tennessee Supreme Court has ruled that a seller generally has a duty to disclose material facts concerning the value of property that is known to the seller, and not reasonably discoverable by the buyer. *Simmons v. Evans,* 206 S.W.2d 295, 295-96 (Tenn. 1947). In the instant case, the Defendants established that they requested the 1997 corporate tax returns from the Halls and the Halls told them they did not have them. The Halls filed the tax returns in July 1998, two months before the close of the transaction, and were aware that the tax returns showed clearly that the company's income was nearly $400,000 less than the amount represented to the Defendants. Viewing the evidence as a whole, we find that it does not preponderate against the trial court's conclusion that the Halls had a duty to disclose the tax information to the Defendants, and the Defendants reasonably relied on the information given to them by the Halls.

The Appellants next argue that the trial court erred by dismissing their complaint against the Defendants for breach of contract. The Tennessee Supreme Court has declared that "[w]hile a contract may be either expressed or implied, or written or oral, it must result from a meeting of the minds of the parties in mutual assent to the terms. . .[and be] free from fraud or undue influence. . . ." *Johnson v. Cent. Nat'l Ins. Co. of Omaha, Nebraska,* 356 S.W.2d 277, 281 (Tenn. 1962); *see also Doe v. HCA Health Services of Tennessee, Inc.,* 46 S.W.3d 191, 196 (Tenn. 2001). We find no error in the trial court's decision to decline to enforce a contract induced by the Appellants' fraud.

The Appellants next argue that the trial court erred by awarding the remedy of rescission in this case. Rescission may be appropriate where a misrepresentation goes to the essence of a contract and materially induces the formation of the contract. *Stonecipher v. Estate of M.E. Gray*, 2001 WL 468673, *5 (Tenn. Ct. App. May 4, 2001) (citing *Cooley v. East & West Ins. Co.*, 61 S.W.2d 656, 659 (Tenn. 1933)*; Cannon v. Chadwell*, 150 S.W.2d 710, 712 (Tenn. Ct. App. 1940)). Rescission is most appropriate where the parties may be returned to their pre-contract status. *Id.* If the passage

of time or a change of circumstances renders a return to the status quo impractical, or an award of damages would more adequately remedy the injury, then rescission should not be awarded. *Id*. Ultimately, the remedy of rescission is not a matter of entitlement; rather, it rests within the trial court's discretion. *Id.* at *6. Notably, the rules governing the rescission of a contract clearly apply to contracts induced by fraud. *See, Simmons v. Evans*, 206 S.W.2d 295 (Tenn. 1947); *Douglas v. Foster*, 2002 WL 83605, *1 (Tenn. Ct. App. Jan. 22, 2002).

The Appellants argue that Sandra Ray, by continuing to operate the business, ratified the contract and cannot be allowed to later rescind it. They contend that the parties cannot be placed back into the status quo, because the Defendants essentially ruined the business once they took over. In our view, the overwhelming weight of the evidence is to the contrary. After taking over the company and discovering its financial and operational problems, Ray attempted, on numerous occasions, to rescind the contract. After her fruitless attempts to rescind, Ray continued to oversee the operations of the company, and even invested more money into it. Had Ray not done so, the Plaintiffs would surely be arguing that she failed to mitigate the damages. The Appellants' next argument, that they cannot be placed back into the status quo because of the collapse of a significant portion of the company during Sandra Ray's term, disregards the bulk of the evidence at trial. The evidence shows clearly that the financial state of the business was plummetting downward under the Halls' watch, but they managed to convey the business to the Defendants shortly before it hit bottom. Moreover, the Halls retook the business from the Defendants, and the evidence does not establish that the parties cannot be placed back into the status quo. Ultimately, the power to order rescission, where appropriate, rests within the sound discretion of the trial court. *Stonecipher*, 2001 WL 468673 at *6; *Douglas*, 2002 WL 83605 at *1. We find no abuse of discretion in the trial court's award of the remedy of rescission.

The Appellants next assert that the trial court erred in its calculation of damages. First, they argue that the trial court's award to Gabriel should be reduced by $50,000, asserting that the purchasers actually paid $20,000 less than the amount the court credited the purchasers with paying. The remaining $30,000, according to the Appellants, should not have been awarded to the purchasers because the purchasers retained that amount in escrow at the time of the purchase. They rely on Ronald Hall's testimony and a trial exhibit to support their contention. Sandra Ray's testimony was to the contrary; she testified that the purchasers paid the $50,000 amount to the Halls. A trial court's determination of the amount of damages is primarily a factual determination. *Beaty v. McGraw*, 15 S.W.3d 819, 827 (Tenn. Ct. App. 1998) (citing *Loftis v. Finch*, 491 S.W.2d 370, 377 (Tenn. Ct. App. 1972); *Scholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d 36, 42 (Tenn. Ct. App. 1995)). In the instant case, the trial court's finding on this issue turns on its determination of the parties' credibility, entitled to great weight on appeal. *See, Mach. Sales Co.*, 103 S.W.3d at 643. With appropriate deference to the trial court's findings on credibility, we find no error in the calculation of damages.

The second argument that the Appellants raise in opposition to the trial court's award of damages was that the trial court should have reduced the award to the purchasers by $400,000, representing the purchasers' unpaid obligations on the non-compete agreement under the contract.

Having found that the trial court's award of rescission was proper, the non-compete agreement would be rescinded as well, so the purchasers would not be obligated to pay for it. This argument is without merit.

The final argument that the Appellants raise on appeal is that the trial judge violated their due process rights by not recusing himself. As evidence of bias, they point to two colloquies between the trial judge and witnesses as evidence of their allegations of bias. The first instance involved the testimony of Lyndon Bates, an officer of Gabriel and business associate of Sandra Ray. Upon being asked if Gabriel believed it was entitled to any portion of the potential recovery of the undisclosed SunTrust Bank litigation, Mr. Bates answered that he "hadn't even thought about it. I know we were not told about the lawsuit or any potential recovery to come." The trial judge responded: "Probably good advice. Sounds like a tar baby to me, stay away from it. . . .[The l]ess you know, probably the better."

The second alleged indication of bias came during Sandra Ray's direct examination. Ray was asked if she felt that the Halls had honestly dealt with Ray. Ray answered that she "felt terrible" and that she did, initially, feel like the Halls had honestly dealt with her. However, Ray's response was meandering and largely unresponsive to the question. Consequently, the judge asked Ray: "Well, the answer is yes?" Ray responded, "The answer is yes." To that, the judge responded, "That was a gimme."

Because the Appellants did not raise the issue of recusal before the trial court rendered its decision, the issue is waived. They cannot wait until they receive an unfavorable result and then assert that the trial judge should have recused himself. ***See, Davis v. Tenn. Dep't. Of Employment Serv.***, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999) (declaring that "recusal motions must be filed promptly after the facts forming the basis for the motion become known . . . and the failure to seek recusal in a timely manner results in a waiver of a party's right to question a judge's impartiality.") (citations omitted). However, even if the issue were not waived, it is wholly without merit. Clearly, all parties below received a fair and impartial hearing.

The decision of the trial court is affirmed. Costs of this appeal are taxed to Appellant/Plaintiff CFSM, Inc. and Plaintiffs/Appellants Ronald Hall and Jacquelene Hall, and their sureties, for which execution may issue, if necessary.

 

_____
HOLLY M. KIRBY, JUDGE