IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
SEPTEMBER 18, 2008 Session

## RONNIE GALE MARTIN v. DEBORAH ELAINE KENT MARTIN

Direct Appeal from the Chancery Court for Tipton County
No. 19560    Martha B. Brasfield, Chancellor

No. W2008-00015-COA-R3-CV - Filed February 24, 2009

This is the second time these parties have been before this court on matters relating to their divorce. In the first appeal, we rejected the husband's argument that he lacked the financial resources to pay the wife in cash for her share of the marital estate. However, we vacated the trial court's award of alimony requiring the husband to pay the wife's health insurance premiums because there was insufficient proof presented regarding the issue at trial. On remand, the trial court allowed the husband to sell various properties in order to pay the wife for her share of the marital estate, but the court refused to require the wife to pay half the income taxes associated with the sales or the real estate taxes on the properties. The trial court found that the husband had the ability to pay the wife's health insurance premiums, and the wife did not, and it ordered the husband to pay such premiums. The trial court also ordered the husband to pay wife post-judgment interest on the original cash award of marital property. In addition, the court found the husband in contempt and ordered him to pay the wife's attorney's fees incurred on remand. The husband appeals. We affirm as modified and remand for further proceedings.

Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed as
Modified and Remanded

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which DAVID R. FARMER, J., and J. STEVEN STAFFORD, J., joined.

J. Thomas Caldwell, Ripley, TN, for Appellant

Julie D. Byrd, Memphis, TN, for Appellee

**OPINION**

## I.   FACTS & PROCEDURAL HISTORY

Ronnie Martin ("Husband") and Deborah Martin ("Wife") were married in 1972. They have two sons who are now adults. Fourteen years into the parties' marriage, in 1986, Husband started a business of building, selling, and renting residential and commercial real estate. Wife worked in the real estate business for some time, but she stayed at home with the children when the parties' second child was born. During the marriage, the parties owned and sold between 150 and 200 residential dwellings. Husband also worked for DuPont for twenty-five years during the marriage. He retired in 2001 due to depression and was subsequently placed on social security disability.

Husband filed a complaint for divorce on July 27, 2001, and Wife subsequently filed a counter-complaint for divorce. At the time of trial, the parties owned 33 pieces of property and were indebted to numerous lenders. Wife had various health problems and sought an award of alimony. Husband was ordered to pay Wife $1,000 per month in temporary alimony, and he was ordered to pay the utility and telephone bills at the parties' residence in Arkansas (where Wife was living), the homeowner's insurance and real estate taxes on the Arkansas home, and insurance on Wife's vehicle and the parties' boats. Wife later filed a petition for contempt, claiming that Husband had only paid her $400 in temporary alimony over the course of a year.

In May of 2003, the trial court entered a final decree of divorce, granting Wife an absolute divorce based upon Husband's inappropriate marital conduct. The trial court valued the marital property and ordered a distribution of the marital property and debt. The court valued the parties' rental property at approximately $2.7 million, and it valued the parties' Arkansas residence at $358,000. A promissory note owed to the parties was valued at $70,000. The parties also owned an $8,000 timeshare and a $6,000 interest in a development. The court found that Husband had obtained and spent $125,000 in retirement funds since the parties separated. The parties also owned various vehicles, boats, and other personal property. However, the mortgages on the rental property and the parties' other debts totaled approximately $2 million.

The trial court ultimately awarded Husband the residence in Arkansas, all the rental real estate, one-half of his Dupont retirement account, and various vehicles and items of personal property. Husband was ordered to pay Wife in cash for much of her share of the marital estate. The court awarded Wife $593,050.72 for her share of the marital property, plus $62,500 for one-half of the dissipated retirement account, and $15,000 for her attorney's fees,[1] in addition to one-half of the Dupont retirement account, various vehicles, boats, and items of personal property. The court's order stated:

> In arriving at a division of the property and payment to each party, the Court believes that the real property should not have to be sold, and that the portion of the debts owed by [Wife] should be subtracted from the value of the property awarded

---

[1]   Regarding the award of attorney's fees, the final order states, "Husband will pay $15,000 of the wife's attorney's fees; the Court feels as if Husband was less than candid with the Court, less than candid in discovery, and that will make up for what is due and owing for that[.]"

to her, and Husband should pay Wife cash for her share therein within sixty (60) days of March 7, 2003; that upon receipt of full payment of her property interest, Wife should quit claim her interest in the real estate to the Husband; there should not be any installment payments because of the problems these parties have had in getting this paid, [Husband] can get access to the cash, and Wife can use the money to get her a house .

> The Court feels as if the real property should not be sold for several reasons, to-wit: (a) the parties are both under the age of 55 years, and the income taxes due from the sale would be astronomical and the real property has depreciation on it; (b) if you put all this rental real estate on the market, the market in this area would be flooded and you wouldn't be able to get what the property was worth; and (c) Wife would not be able to collect rent, but that Husband is able to collect the rent[.]

The order provided that Wife would be allowed to remain in the Arkansas residence until Husband paid Wife for her share of the marital estate, and Husband was ordered to continue paying the aforementioned bills and temporary alimony during that time. Husband was also specifically ordered to pay his Internal Revenue Service quarterly taxes for 2003, in addition to all property taxes on the real estate for 2003. As alimony, the trial court ordered Husband to pay Wife's medical insurance premiums for three years, and thereafter, fifty dollars a month. The order stated that the court was concerned about Wife losing her health insurance after the divorce due to her poor health and her inability to work. The trial court found that Husband had an ability to work and collect rents, as he had been "driving stock cars, of all things."

Husband filed a motion to alter or amend, claiming, among other things, that he was unable to obtain financing to pay Wife in cash for her portion of the marital estate. Husband proposed that he be allowed to refinance the property and pay Wife for her share in installments over the next twenty years. Alternatively, he sought an order allowing the property to be auctioned, although he admitted in his motion that "a forced sale will result in a greatly diminished value for the property." Husband also asked that Wife be ordered to pay one-half of the real estate taxes for 2003. The trial court entered an order denying Husband's motion with the following explanation:

> The Court ordered the Husband to pay the Wife's interest in cash. The Husband states that he has been unable to obtain financing to pay the Wife in cash, and has asked that the property be sold. The Court points out that the Husband will owe the Wife $670,550.72, which includes the net value of the property, ½ of the Husband's retirement, and attorney fees to be paid to the Wife. The parties have a residence in Arkansas, which is worth $358,000, and upon which there is no mortgage. The parties also own two other pieces of real estate (2.28 acres on Randolph Road and Lot 62, Marshall Acres) upon which there is no mortgage. These three properties can be sold and the proceeds given to the Wife. Further, there is a promissory note of $70,000 which can be transferred to the Wife. The Husband has personal property which can be sold and the proceeds given to the Wife. The Court sees no reason to order structured payment of the money which the Husband owes to the Wife or to

-3-

order all of the real property sold. The Court is concerned that, if all property is sold, the tax consequences would be such that the parties would not reap the full value of their property.

. . . .

The Husband wishes to amend the decree to require property taxes for 2003 to be paid from the sale of the property, if sold. Husband was awarded the property. He should be required to pay the taxes.

Husband appealed to this Court, challenging, among other things, the trial court's alimony award and marital property division.

On appeal, this Court vacated the trial court's alimony award requiring Husband to pay Wife's health insurance and remanded for further proceedings. *Martin v. Martin*, 155 S.W.3d 126, 131 (Tenn. Ct. App. 2004). Wife had sought alimony, but she never specifically requested that Husband pay her health insurance premiums. Consequently, "there was no proof offered as to whether Wife, in her condition, could be insured and if so, the cost of the premiums and whether the Husband has the ability to pay those premiums." *Id.* This Court remanded for the parties to present evidence on the limited issue of Wife's health insurance. *Id.* We affirmed the trial court's award of $50 per month in alimony in futuro to be paid following the three years of Husband paying Wife's health insurance. *Id.*

Next, we addressed Husband's assertion that the trial court erred in requiring him to pay Wife, in cash, for her interest in the real estate. Husband argued that "his present financial situation [would] not allow him to obtain the financing needed to pay Wife." *Martin*, 155 S.W.3d at 132. We found that Husband had the ability to refinance some of the rental property in order to pay much of Wife's share. *Id.* at 132. In addition, we noted the trial court's specific findings regarding Husband's ability to sell the unencumbered real estate and personal property, or transfer the $70,000 note receivable, in order to pay Wife. *Id.* at 132-33. As such, we concluded that "the trial court did not err in finding that Husband has sufficient resources from which he could pay Wife's interest in the real estate." *Id.* at 133.

This Court's opinion in *Martin* was filed on July 14, 2004, and we denied Husband's petition to rehear on August 11, 2004. The Supreme Court denied Husband's application for permission to appeal on November 29, 2004. On October 28, 2004, Wife filed, in the trial court, a petition for contempt alleging that Husband had failed to pay the temporary alimony or household bills, which he was ordered to pay until Wife received her share of the marital estate. Wife claimed that the electricity and water service to the Arkansas home had been shut off, and she had been living without electricity for over two months. Husband filed a response in which he contended that he had no funds available to pay Wife.

On November 24, 2004, the trial court ordered Husband to immediately have the utilities turned back on at the Arkansas residence. The court further ordered that the unencumbered real

estate be sold, and the proceeds from the sale of the properties be deposited with the clerk of the court.

On February 7, 2005, Husband filed a petition seeking permission from the trial court to sell four *encumbered* properties, stating that he had received legitimate contracts for the sale of the properties at fair market value. Husband subsequently filed amended petitions seeking permission to sell other encumbered properties. The trial court entered an order approving of the proposed sales and ordering Wife to execute the documents required to complete the sales. The sale proceeds were to be deposited with the clerk of the court. The order also authorized additional sales of other parcels under the same terms. The clerk was authorized to pay delinquent real estate taxes from the proceeds. In addition, Husband was to be paid $20,000 to repair other properties he intended to sell, and Wife was to receive the balance of the proceeds from these sales. On September 13, 2005, the trial court ordered Wife to move out of the Arkansas residence. Husband was subsequently ordered to make repairs to the Arkansas property and then list it for sale. As more sales took place, the court entered additional orders authorizing the disbursement of certain amounts to Wife and to Husband. The trial court ordered the clerk to remit $126,250 to the Internal Revenue Service to pay Husband's income tax liability for the year 2005. The clerk also paid Husband's attorney's fees from the sale proceeds.

The trial court held a hearing on April 24, 2007, to address the issues remaining between the parties.[2] It was undisputed that Wife had not received all the cash or personal property that she was awarded in the final decree of divorce, and the court had not yet addressed the issues regarding Wife's health insurance premiums. Of the original $670,550.72 awarded to Wife, Husband had paid $566,529.48. Wife asked the trial court to impose post-judgment interest on the award to be calculated since the final decree of divorce. In addition, Wife had never received several items of personal property that she was awarded in the divorce decree, including a motor home, a pontoon boat, a 1955 Chevrolet Nomad vehicle, and a limited edition ski boat, and she sought an order requiring Husband to produce these items. Wife also sought additional attorney's fees. Husband claimed that Wife should be responsible for paying one-half of the real estate taxes on the properties and one-half of his income taxes, claiming that he incurred the income taxes due to the capital gains he realized when he sold most of the rental properties to pay Wife.

At trial, Husband testified that he did not pay Wife for her share of the marital estate because he had no way to acquire the money without selling the rental properties. He testified that he currently owned eight properties in Tipton County, Tennessee, and the residence in Arkansas, and he said he could mortgage those properties to pay Wife the balance of what he owed her. Husband was living in the Arkansas residence with his new wife. Husband testified that he received $1,700 per month from social security disability and $659 a month in disability payments from Dupont. In addition, Husband had received all rental income from the real estate business since the divorce. He had also claimed all the depreciation and other deductions for the rental properties since the divorce. In 2005, Husband realized $730,824 in capital gains from selling the rental properties, and his

_____
[2] Nineteen exhibits were introduced at this hearing, but they are not included in the record before us.

income tax liability for that year was $121,000. Husband incurred additional penalties and interest on that amount, so that his ultimate tax liability for 2005 was $130,531. The trial court had ordered that $126,250 from the sale proceeds be paid to the Internal Revenue Service, but Husband testified that he still owed an additional $4,400 for 2005. Husband testified that in 2006, he sold an additional ten properties for a total of nearly $1 million, and he expected his 2006 income tax liability to be around $100,000. Husband testified that the clerk had paid, from the sale proceeds, $78,242 in real estate taxes on the properties, which was owed through 2003, but he said he still owed around $30,000 for the real estate taxes for 2004, 2005, and 2006.

Husband admitted that he did not pay Wife temporary alimony for ten months in 2004, but he claimed that he could not afford to pay her. Husband testified that he sold the limited edition ski boat and motor home that the trial court awarded to Wife in the divorce decree and used the funds to survive. He testified that the 1955 Nomad was damaged when the building where it was stored flooded, and "it got discarded." Husband acknowledged that there was a Nomad in his garage at the Arkansas residence, but he said it belonged to someone else.

Husband admitted that in July of 2005, he bought a second house in Arkansas for a total of $77,900, with a down payment of approximately $15,000. He said he sold a Harley Davidson motorcycle to acquire the money for the down payment, and he borrowed $62,490 from a bank. Husband still owned the house at the time of trial. Husband also acknowledged that he received payment in full of the $70,000 note receivable in 2003, and he did not give any of the money to Wife.

George Lyell, one of Husband's tenants, testified that the 1955 Nomad was damaged in a flood while being stored at the property he rents from Husband. Mr. Lyell said he arranged for someone from a scrapyard to haul off the Nomad approximately two to three years prior to trial.

Husband and Wife's adult son, Rodney Martin, testified that he was at the Arkansas residence where Husband was living in December of 2006, just four months prior to trial, and he saw the 1955 Nomad in a shop building on the property. He testified that he was familiar with the Nomad from working on it with Husband, and he said the Nomad was the same one owned by the parties during the marriage. Mr. Martin testified that he also saw the limited edition ski boat, which had been awarded to Wife, in the shop at the Arkansas residence. Mr. Martin testified that the shop was filled with other vehicles and items that Husband did not own prior to the divorce, including a Mustang race car and trailer, a limited edition Camaro, two Harley Davidson motorcycles, a Honda motorcycle, three new four-wheelers, and a brand new riding lawnmower. In addition, Mr. Martin observed six cabinets and two new, large toolboxes, approximately waist high and six feet long, filled with "a substantial amount of tools" and "stuff for the race cars." Mr. Martin testified that Husband had made substantial improvements to the property as well, such as landscaping, paving the driveway, fencing "all around the backside of the property," building a dog kennel, and installing a stone wall with two iron gates.

Wife's sister testified that Wife is unable to work because she suffers from rheumatoid arthritis and degenerating discs in her back. Wife's sister said she had been paying Wife's water bill and loaning her money to "to live on."

Wife was fifty-five years old at the time of trial. She testified she had not worked outside of the real estate business since 1983. Wife testified that she was currently receiving $660 per month from her share of the Dupont retirement account that was divided in the divorce decree. She said she had not received any of the rental income from the real estate business since the divorce in 2003, nor had she claimed any tax deductions related to the business. Wife testified about living in the Arkansas residence for several months without electricity. She said she received food stamps during that time and visited a local food bank. Wife said she did not receive any money from Husband as payment toward her portion of the marital estate until 2005. She then bought a house and a car. Wife also testified that she was forced to pay debts that Husband was ordered to pay in the final divorce decree because she was threatened with a lawsuit. Wife testified that Husband told her he would "see [her] in hell" before she got the limited edition ski boat.

Wife testified that her COBRA coverage began in March or April of 2005 and was set to expire in March of 2008. She said she had made all the COBRA payments herself. The premium in 2005 was $562.03, then in 2006 it increased to $754.04, and in January of 2007, it decreased to $658.34. Wife testified she had applied for private health insurance coverage, but she was denied because she had too many pre-existing conditions. She testified she suffered from a degenerative disc disease, rheumatoid arthritis, thyroid problems, and severe depression. Wife said she previously had back surgery, but some days she could barely get out of bed due to her herniated discs.

The trial court entered its final order on December 6, 2007.[3] The trial judge noted that she did believe the testimony of Wife, and she did not believe the testimony of Husband. The order also states, in pertinent part:

> The Court has listened to the testimony and continues to find the testimony of [Husband] not as credible as [Wife]'s. In fact, the Court finds that some of his actions are egregious. [Husband] has said that he is strapped financially, yet, at the hearing, it came out that he had bought another place to live or to work from in Arkansas. . . . He is now in the [other] home in Arkansas. The testimony was that he has added a nice, new garage and workroom to this house. It houses boats and cars. There is a nice, brick wall and a fence with wrought-iron gates. There is a long driveway that is asphalted. . . . He spent a great deal of money to increase the value of this property. Furthermore, he married in this house and had a nice reception there.

The court also noted that Husband did not pay Wife any of the $70,000 payment he received on the promissory note. In addition, the trial court specifically found that the 1955 Nomad and limited edition ski boat owned during the parties' marriage were located in the shop at the Arkansas

---

[3] A subsequent order was entered *nunc pro tunc* to clarify the previous order.

residence. The court found that Husband's tenant who testified about discarding the Nomad was "not a very credible person." The court ordered Husband to return the Nomad and ski boat to Wife and to pay Wife in cash for the value of the other vehicles he sold. The order provided that Husband would pay ten percent interest on this award until it was paid. The trial court ordered Husband to pay Wife post-judgment interest on the cash award at the rate of 6% from the time of the divorce. The judge stated, "I am lowering that interest – and I'll say why – because the Wife was in the house."

Regarding the real estate taxes, the order states, "the Court expected that [Husband] was going to be paying the real estate property taxes, or the county property taxes, because the mortgage payments were supposed to be paying those. He was responsible." As for the income taxes, the order states:

> . . . [Husband] was the one who sold the properties. He was the one who determined what was sold and the price. I realize that he was the one in charge, but there was property in Tipton County that had no debt. He could have sold this property and given [Wife] her fair share – or part of her share – quicker.
> . . . .
> [Husband] also wants [Wife] to pay her share of the income tax that was due on the sale of the rental property in Tipton County. . . . [Husband] is now in a residence in Arkansas that was marital property, that he has improved, and it is worth more than it was worth at the time of the divorce. If he were to sell this property after the age of 55, he would not have to pay any income taxes. The Court is concerned that he wants [Wife] to share in the income taxes of the rental property that was sold, and then he will get his share basically income tax free. This would be a windfall for [Husband].
> . . . .
> . . . And he will pay the income taxes. It would be unfair for him to receive the property that he does not have to pay income tax on.

The court found that Wife was unable to obtain private insurance and unable to afford her COBRA premiums. The court discussed her sparse work history, noting that she was previously a stay-at-home mother who had worked at only low-paying jobs. The court also found that Wife's health had been deteriorating for years due to rheumatoid arthritis and degenerative disc disease. The court found that Husband was "living a nice lifestyle" and had the ability to pay the actual amount of the COBRA premiums. The court ordered Husband to be "responsible for those from the time [Wife] began to pay those." The court also found that Husband was in contempt of court, stating, "The Court does not think that the Husband has dealt fairly with the Wife, based on the statements already made." The trial court ordered Husband to pay Wife $24,802.93 for her post-trial attorney's fees. Husband timely filed a notice of appeal.

## II. ISSUES PRESENTED
On appeal, Husband presents the following issues for review:

1.  Whether the trial court erred in failing to order Wife to pay half the income taxes resulting from the sale of the marital real estate;
2.  Whether the trial court erred in requiring Husband to pay all the real estate taxes;
3.  Whether the trial court erred in requiring Husband to pay Wife's medical insurance premium;
4.  Whether the trial court erred in assessing interest against Husband on the value of Wife's cash award for the marital real estate;
5.  Whether the trial court erred in awarding Wife attorney's fees.

For the following reasons, we affirm the decision of the chancery court as modified and remand for further proceedings.

### III.  STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them.  Tenn. R. App. P. 13(d) (2008); **Bogan v. Bogan**, 60 S.W.3d 721, 727 (Tenn. 2001).  For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect.  **Watson v. Watson**, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)).  "When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues." **Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC**, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002).  The weight, faith, and credit to be given to a witness's testimony lies, in the first instance, with the trier of fact, and the credibility accorded will be given great weight on appeal.  **Id.**  We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness.  **Union Carbide Corp. v. Huddleston**, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

### IV.  DISCUSSION

#### *A.  Income Taxes*

Without citing any authority, Husband claims that it was inequitable for the court not to require Wife to pay half the income taxes that resulted from the sale of the rental properties. Husband was originally ordered to pay Wife in cash for her share of the marital estate in 2003.  In the final decree of divorce, the trial court made detailed findings regarding the award:

> In arriving at a division of the property and payment to each party, the Court believes that the real property should not have to be sold, and that the portion of the debts owed by [Wife] should be subtracted from the value of the property awarded to her, and Husband should pay Wife cash for her share therein within sixty (60) days of March 7, 2003; that upon receipt of full payment of her property interest, Wife

should quit claim her interest in the real estate to the Husband; there should not be any installment payments because of the problems these parties have had in getting this paid, [Husband] can get access to the cash, and Wife can use the money to get her a house .

The Court feels as if the real property should not be sold for several reasons, to-wit: (a) the parties are both under the age of 55 years, and the income taxes due from the sale would be astronomical and the real property has depreciation on it; (b) if you put all this rental real estate on the market, the market in this area would be flooded and you wouldn't be able to get what the property was worth; and (c) Wife would not be able to collect rent, but that Husband is able to collect the rent[.]

When Husband subsequently filed a motion to alter or amend, claiming that he could not obtain financing to pay Wife in cash for her interest, the trial court denied the motion, stating:

The Husband states that he has been unable to obtain financing to pay the Wife in cash, and has asked that the property be sold. The Court points out that the Husband will owe the Wife $670,550.72 . . . . The parties have a residence in Arkansas, which is worth $358,000, and upon which there is no mortgage. The parties also own two other pieces of real estate (2.28 acres on Randolph Road and Lot 62, Marshall Acres)[4] upon which there is no mortgage. These three properties can be sold and the proceeds given to the Wife. Further, there is a promissory note of $70,000 which can be transferred to the Wife. The Husband has personal property which can be sold and the proceeds given to the Wife. The Court sees no reason to order structured payment of the money which the Husband owes to the Wife or to order all of the real property sold. The Court is concerned that, if all property is sold, the tax consequences would be such that the parties would not reap the full value of their property.

In the first appeal to this Court, Husband continued to argue that "his present financial situation [would] not allow him to obtain the financing needed to pay Wife." *Martin*, 155 S.W.3d at 132. We found that "Husband has sufficient resources from which he could pay Wife's interest in the real estate." *Id.* at 133. We discussed Husband's unencumbered properties and personal property that could be sold, in addition to the $70,000 note receivable that could be transferred to Wife. *Id.* at 132-33. In addition, we found that Husband had the ability to refinance at least some of the rental property in order to pay much of Wife's share. *Id.* at 132. Therefore, we affirmed the trial court's order requiring Husband to pay Wife in cash for her share of the marital property.

On remand, the trial court ordered Husband to sell the unencumbered properties, but Husband petitioned for permission to sell encumbered rental properties. When Husband later claimed that Wife should pay half the income taxes he incurred from the sales, the trial court rejected his

---

[4] The court valued these two unencumbered properties at $59,900 and $16,100, respectively, for a combined value of $76,000.

argument, stating, "[Husband] was the one who sold the properties. He was the one who determined what was sold and the price. . . . [T]here was property in Tipton County that had no debt. He could have sold this property and given [Wife] her fair share – or part of her share – quicker." The court also noted that Husband could have sold the $358,000 Arkansas residence, and that he did not pay Wife anything when he received payment of the $70,000 promissory note.

In this appeal, Husband continues to argue that he was unable to borrow sufficient funds to pay Wife in cash for her interest. Although Husband may not have been able to *borrow* the total amount, this Court and the trial court have already concluded that Husband had sufficient resources following the divorce from which he could have paid Wife's interest in the real estate. Everyone involved recognized that if the rental properties were sold in order to pay the award, unfavorable tax consequences would result. Yet that is precisely the course of action Husband chose. We reject Husband's argument that it is inequitable for him to bear the tax liability resulting from the sales.

## B.   Real Estate Taxes

In the final decree of divorce, the trial court ordered Husband to pay "all property taxes on the real estate for 2003." When the rental properties were being sold in 2005, the trial court authorized the clerk to pay $78,242 from the sale proceeds toward the real estate taxes owed through 2003. Husband contends that the trial court should have held Wife responsible for one-half of the 2003 real estate taxes. He cites no authority in support of his argument. In the original appeal of this case, we rejected Husband's argument that the trial court erred in requiring him to pay all the real estate taxes for 2003. *Martin*, 155 S.W.3d at 133. We decline to reconsider the issue in this appeal.

Husband also argues, without citation to authority, that the trial court should have held Wife responsible for one-half of the $30,000 in real estate taxes owed for 2004, 2005, and 2006 because he "had no authority to sell or mortgage the property to pay the taxes." Although Wife was not ordered to convey her interest in the real estate to Husband until she received full payment for her share of the marital estate, Husband had full control over the business. The trial court ordered the unencumbered properties sold, but Husband chose to sell other properties. As the trial court noted in its final order, "[Husband] was the one who determined what was sold and the price." He received all rental income and tax benefits from the properties, and it was equitable for the trial court to require him to pay the real estate taxes. Moreover, we find that Husband had sufficient resources from which he could have paid the real estate taxes. He received a $70,000 payment on a note in 2003. He was able to buy a second home in Arkansas in 2005, which he still owned at the time of trial. At the time of trial, Husband was living in a home worth over $358,000, with no mortgage, which he had substantially improved since moving in. Husband also had various new vehicles and other items in the garage at his residence in Arkansas. In short, the evidence supports the trial court's observation that Husband was "living a nice lifestyle," and we find no support for Husband's assertion that Wife should have been required to pay the real estate taxes.

## C.   Wife's Medical Insurance

Next, Husband argues that the trial court erred in requiring him to pay Wife's medical insurance because "[t]here was no evidence Husband has the ability to pay those premiums." Again, Husband does not cite any authority regarding this issue, but he claims that "[h]is income tax returns verified a financial disaster." As previously discussed, we conclude that Husband created the disaster regarding his income tax situation. He owned various unencumbered properties that could have been sold in order to obtain much of what he owed Wife. The evidence supports the trial court's conclusion that Wife could not obtain private insurance or afford her COBRA premiums, and Husband could afford to pay such premiums. Thus, we affirm the trial court's order requiring Husband to pay Wife's COBRA premiums for three years.

In Wife's brief on appeal, she contends that Husband did not pay any of her COBRA premiums pending appeal, from the date of the final order in the trial court, December 6, 2007, to the date when the COBRA coverage expired in March of 2008. She asks us to adjudicate Husband's liability for the entire thirty-six months of coverage. We conclude that the trial court should address this issue on remand as necessary.

### D.    Interest

Husband challenges the trial court's decision to require him to pay 6% post-judgment interest on the cash award to Wife. He claims that he should not be required to pay any post-judgment interest on the award. Wife argues that she was entitled to post-judgment interest at the rate of 10% pursuant to Tennessee Code Annotated section 47-14-121. This issue presents a question of law, which we review de novo with no presumption of correctness. *Vooys v. Turner*, 49 S.W.3d 318, 321 (Tenn. Ct. App. 2001).

"Tennessee law requires the payment of postjudgment interest." *Vooys*, 49 S.W.3d at 321. Tennessee Code Annotated section 47-14-102(8) defines "interest" as "compensation for the use or detention of, or forbearance to collect, money over a period of time[.]" "Post-judgment interest compensates the party who was entitled to money but deprived of its use by requiring an additional payment by one who benefitted from retaining the money." *Lucius v. City of Memphis*, 925 S.W.2d 522, 526 (Tenn. 1996). "'The right to post-judgment interest is statutory.'" *State v. Thompson*, 197 S.W.3d 685, 693 (Tenn. 2006) (quoting *Varnadoe v. McGhee*, 149 S.W.3d 644, 650 (Tenn. Ct. App. 2004)). Tennessee Code Annotated section 47-14-121 provides that interest on judgments "shall be computed at the effective rate of ten percent (10%) per annum," unless otherwise provided by statute or contract. This statute is mandatory, and courts are not free to ignore it. *Thompson*, 197 S.W.3d at 693. Interest on judgments in Tennessee "shall be computed at the effective rate of ten percent per annum." *Tallent v. Cates*, 45 S.W.3d 556, 563 (Tenn. Ct. App. 2000) (quoting Tenn. Code Ann. § 47-14-121). Cash awards in divorce cases are money judgments subject to the statutory rate. *Haren v. Haren*, No. 03A01-9707-CV-00253, 1998 WL 10358, at *4 (Tenn. Ct. App. E.S. Jan. 13, 1998) (citing *Inman v. Inman*, 840 S.W.2d 927, 931 (Tenn. Ct. App. 1992)).

Husband correctly cites *Price v. Price*, 472 S.W.2d 732 (Tenn. 1971) for the notion that interest is not due on a judgment until the successful party is entitled to the use of the money

awarded. In *Price*, a wife had been awarded a money judgment payable in installments, and the husband paid the installments in full when due. *Id.* at 733. However, the wife claimed that she was entitled to post-judgment interest from the date of entry of the judgment. *Id.* at 732. The Supreme Court held that she was not entitled to post-judgment interest because she was not entitled to the use of the money until the installments became due. *Id.* at 734. In this appeal, Husband claims that "Wife was not entitled to the use of the money represented by the judgment until the parties' joint property was sold." We disagree. The final decree of divorce ordered Husband to pay Wife for her share of the marital real estate within sixty days of March 7, 2003. It did not require payment only upon the sale of certain properties. The trial court and this Court specifically found that Husband had the financial resources to pay Wife. Thus, Husband is not entitled to relief under the reasoning of *Price* or the other two cases he cites on appeal.

Next, we must consider Wife's argument that the trial court erred in awarding her post-judgment interest at the rate of 6% rather than 10%. The trial judge noted that she was only awarding Wife 6% interest because Wife was allowed to reside in the Arkansas residence until September 30, 2005. As stated above, Tennessee Code Annotated section 47-14-121 is a mandatory statute. The rate of interest prescribed by the statute "is deemed controlling and not subject to reduction by reason of equitable considerations." *Bedwell v. Bedwell*, 774 S.W.2d 953, 956 (Tenn. Ct. App. 1989); *see also Childress v. Union Realty Co., Ltd.*, No. W2003-02934-COA-R3-CV, 2005 WL 711960, at *5 (Tenn. Ct. App. Mar. 28, 2005) *perm. app. denied* (Tenn. Oct. 31, 2005) (discussing the "mandatory rate of 10%"); *Haren*, 1998 WL 10358, at *4 (modifying a post-judgment interest award from 6% to 10%); *Perkins v. Perkins*, No. 01A01-9504-CV-00158, 1995 WL 675850, at *3 (Tenn. Ct. App. W.S. Nov. 15, 1995) (same). Therefore, we modify the trial court's award of post-judgment interest from the rate of 6% to 10%.

### E. Attorney's Fees

Finally, Husband argues, without citation to authority, that it was inequitable for the trial court to award Wife her attorney's fees on remand. The trial court found Husband in contempt and ordered payment of Wife's post-trial attorney's fees. An award of attorneys' fees based upon a finding of contempt is reviewed under the less stringent abuse of discretion standard, and we will not modify a punishment imposed for contempt unless the complaining party can show that the trial court abused its discretion. *Outdoor Mgmt., LLC v. Thomas*, 249 S.W.3d 368, 377 (Tenn. Ct. App. 2007). We find no abuse of the trial court's discretion.

Wife has requested an award of her attorney's fees on appeal. The decision to award damages for the filing of a frivolous appeal rests solely in the discretion of this Court. *Whalum v. Marshall*, 224 S.W.3d 169, 180-81 (Tenn. Ct. App. 2006) (citing *Banks v. St. Francis Hosp.*, 697 S.W.2d 340, 343 (Tenn. 1985)). "Successful litigants should not have to bear the expense and vexation of groundless appeals." *Id.* (quoting *Davis v. Gulf Ins. Group*, 546 S.W.2d 583, 586 (Tenn. 1977)). An appeal is frivolous when it has "no reasonable chance of success," or is "so utterly devoid of merit as to justify the imposition of a penalty." *Id.* (citing *Combustion Eng'g, Inc. v. Kennedy*, 562 S.W.2d 202, 205 (Tenn. 1978); *Jackson v. Aldridge*, 6 S.W.3d 501, 504 (Tenn. Ct.

App. 1999)). We exercise our discretion under this statute sparingly so as not to discourage legitimate appeals. *Id.* However, after reviewing the record and Husband's arguments on appeal, we find his appeal is devoid of merit and had no reasonable chance of success. For four of the five issues Husband presented on appeal, he cited no authority. Wife should not be forced to bear the expense of defending against Husband's groundless appeal. We remand the case to the trial court to assess appropriate damages as set forth in Tennessee Code Annotated section 27-1-122.

## V. CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court as modified and remand for further proceedings. Costs of this appeal are taxed to the appellant, Ronnie Gale Martin, and his surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.