# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### December 13, 2012 Session

# THAIS M. LAY v. MILLARD C. WALLACE and IRIS CARRINGTON

**Direct Appeal from the Chancery Court for Henderson County**
**No. 17329     James F. Butler, Chancellor**

---

**No. W2011-02285-COA-R3-CV - Filed February 21, 2013**

---

This case involves the status of a road as public or private, as well as Plaintiff's right to access such. We find that the roadway was a public road prior to 1960, but that it has since been abandoned. Finding no necessity, we further conclude that Plaintiff is not entitled to a private easement over the road to access her property. We affirm the trial court's dismissal of Plaintiff's complaint.

**Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Chancery Court Affirmed**

ALAN E. HIGHERS, P.J., W.S., delivered the opinion of the Court, in which DAVID R. FARMER, J. and HOLLY M. KIRBY, J., joined.

Stephen L. Hughes, Milan, Tennessee; Thomas F. Bloom, Nashville, for the appellant, Thais M. Lay and Brent Lay

Lowe Finney, Jackson, Tennessee, for the appellees, Millard C. Wallace and Iris Carrington

## OPINION

### I. FACTS & PROCEDURAL HISTORY

On July 14, 2003, Thais M. Lay filed a "Complaint for Ingress and Egress" in the Henderson County Chancery Court against adjacent landowners Millard C. Wallace and Iris Carrington. Mrs. Lay claimed that defendants had obstructed her access to the T.M. Maxwell Road,[1] which she claimed was "the only way by which [she] could have ingress and egress to and from her property on both the North and South sides." She sought "proper ingress and egress to her property over the *public road* known as the T.M. Maxwell Road, or in the alternative . . . an easement or right-of-way for purposes of ingress and egress to her property over and along the T.M. Maxwell Road[.]" (emphasis added). Defendants Millard Wallace[2] and Iris Carrington filed separate answers denying that the T.M. Maxwell Road was a public road and contending that Mrs. Lay was not entitled to an easement because she could access her property via another roadway.

Following the resolution of various motions, the case was bifurcated, with the issue of the T.M. Maxwell Road's status as public or private to be considered first.[3] A bench trial was held over three days in 2006, 2007 and 2009. Thereafter, on May 7, 2009, the chancery court issued a thorough letter, which was attached to, and incorporated into, a July 16, 2009 Order. The trial court determined that the T.M. Maxwell Road "is not and was not a public road[,]" and therefore, that Mrs. Lay could not "acquire the rights of an abutting landowner upon the closing of, or abandonment of, a public road." Additionally, the court concluded that Mrs. Lay was not entitled to any easement across the defendants' respective properties. Thus, the chancery court dismissed Mrs. Lay's complaint.

---

[1] The parties dispute whether the roadway in question possesses a name; however, for clarity, we will, at times, refer to the roadway as the "T.M. Maxwell Road."

[2] In his Answer, Mr. Wallace filed a "Cross-Complaint and Counter-Complaint" against Mrs. Lay and her husband, Brent Lay, claiming that the Lays had extensively damaged his timber and the T.M. Maxwell Road while removing "an old house" from Mrs. Lay's property. Mr. Wallace died on April 11, 2011, and his heirs were ultimately substituted as defendants in this case. In 2012, the Heirs of Millard Wallace voluntarily dismissed their claims against Mr. and Mrs. Lay without prejudice.

[3] The chancery court stated that if it concluded that the T.M.Maxwell Road was a public road, it would then "hear the matter on the issue of damages, fees, discretionary cost[s] and any other remaining issues."

Both defendants, Iris Carrington and Millard C. Wallace, died following trial. Their respective heirs at law were substituted as defendants. Plaintiffs timely appealed to this Court.[4]

## II. ISSUE PRESENTED

The sole issue on appeal is whether the evidence preponderates against the chancery court's finding that the T.M. Maxwell Road was never a public road. For the following reasons, we conclude that the T.M. Maxwell Road was a public road prior to 1960 which has since been abandoned; however, finding no necessity, we further conclude that Plaintiff is not entitled to a private easement over the road to access her property.

## III. STANDARD OF REVIEW

On appeal, a trial court's factual findings are presumed to be correct, and we will not overturn those factual findings unless the evidence preponderates against them. **Tenn. R. App. P. 13(d)**; *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). For the evidence to preponderate against a trial court's finding of fact, it must support another finding of fact with greater convincing effect. *Watson v. Watson*, 196 S.W.3d 695, 701 (Tenn. Ct. App. 2005) (citing *Walker v. Sidney Gilreath & Assocs.*, 40 S.W.3d 66, 71 (Tenn. Ct. App. 2000); *The Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 596 (Tenn. Ct. App. 1999)). When the resolution of the issues in a case depends upon the truthfulness of witnesses, the fact-finder, who has the opportunity to observe the witnesses in their manner and demeanor while testifying, is in a far better position than this Court to decide those issues. *Mach. Sales Co., Inc. v. Diamondcut Forestry Prods., LLC*, 102 S.W.3d 638, 643 (Tenn. Ct. App. 2002). "The weight, faith, and credit to be given to any witness's testimony lies in the first instance with the trier of fact, and the credibility accorded will be given great weight by the appellate court." *Id.* When the trial court makes no specific findings of fact, we review the record to determine where the preponderance of the evidence lies. *Ganzevoort v. Russell*, 949 S.W.2d 293, 296 (Tenn. 1997) (citing *Kemp v. Thurmond*, 521 S.W.2d 806, 808 (Tenn. 1975)). We review a trial court's conclusions of law under a *de novo* standard upon the record with no presumption of correctness. *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993) (citing *Estate of Adkins v. White Consol. Indus., Inc.*, 788 S.W.2d 815, 817 (Tenn. Ct. App. 1989)).

---

[4]Because Millard Wallace testified at trial and Iris Carrington testified by deposition, we will continue to refer to the defendants as individuals, as opposed as to their respective heirs.

## IV. DISCUSSION

### *A. Status of Road as Public or Private*

The roadway at issue in this case–the T.M. Maxwell Road–runs in a general north and south direction between Blankenship Road to the north and Ararat Cemetery Road[5] to the south. The northern and middle portions of the roadway traverse property owned by defendant Millard Wallace; however, at three points, the roadway crosses property owned by Mrs. Lay. The southern end of the roadway lies on property owned by defendant Iris Carrington.

On appeal, we are asked to consider only whether Mrs. Lay is entitled to access the T.M. Maxwell Road. Mrs. Lay concedes that the roadway is *no longer* public; however, she contends that the roadway was public *prior to 1960*, and, therefore, as an abutting landowner, that she is entitled to a private easement of access over the road. Appellees argue that Mrs. Lay is not entitled to use the road because, they claim, the roadway has never, at any time, been open to the public. Instead, they contend that any public use of the roadway was simply *permissive*–never converting the roadway into a public road.[6]

A public road may be created "by an act of the public authorities, or the express dedication of the owner, or an implied dedication by means of the use by the public and acceptance by them with the intention of the owner that the use become public, or by adverse user for a period of 20 years continuously creating a prescriptive right . . . ." **Standard Life Ins. Co. v. Hughes**, 315 S.W.2d 239, 242 (Tenn. 1958). "Dedication arises from an owner's offer of land for public use, and a public acceptance of the offer." **Davis v. Bowers**, No. E2011-00295-COA-R3-CV, 2012 WL 762442, at *10 (Tenn. Ct. App. Mar. 9, 2012) (internal citations omitted). "The offer and acceptance may be express or implied." **Id.** (citing *Town of Benton v. People Bank of Polk County*, 904 S.W.2d 598, 602 (Tenn. Ct. App. 1995); *Winn v. Tucker Corp.*, 848 S.W.2d 64, 68 (Tenn. Ct. App. 1992)).

In this case, Mrs. Lay apparently relies upon the implied dedication and implied acceptance avenues for creation of a public road. "When an implied dedication is claimed, the focus of the inquiry is whether the landowner intended to dedicate the land to a public use." **Klein v. Hardin County**, No. W2011-01944-COA-R3-CV, 2012 WL 3518345, at *4 (Tenn. Ct. App. Aug. 16, 2012) (citing *McCord v. Hays,* 302 S.W.2d 331 (Tenn. 1957);

---

[5]In the record, this road is also referred to as Ariat Cemetery Road and Mt. Ararat Cemetery Road.

[6]It appears that in the trial court Appellant claimed an easement by implication, a prescriptive easement, and an easement by necessity. The trial court's rejection of these claims is not appealed.

*Johnson City v. Wolfe,* 52 S.W. 991 (Tenn.1899); *Nicely v. Nicely,* 232 S.W.2d 421 (Tenn. Ct. App. 1949)). "To establish a dedication by implication 'there must be proof of facts from which it positively and unequivocally appears that the owner intended to permanently part with his property and vest it in the public, and that there can be no other reasonable explanation of his conduct.'" ***Sanders v. Mansfield***, No. 01-A-01-9705-CH002222, 1998 WL 57532, at *3 (Tenn. Ct. App. Feb. 13, 1998) (quoting *McKinney v. Duncan*, 118 S.W. 683 at 684, 121 Tenn. 265 at 271 (Tenn. 1908)); *see also Buckingham v. Thomas*, No. 02A01-0412-CH-00278, 1996 WL 20527, at *3 (Tenn. Ct. App. W.S. Jan. 16, 2006) ("Dedication of a . . . roadway may be shown by conduct of the owner and it is not necessary to prove formal overt acts.") (citation omitted).

"Among the factors that indicate an intent to dedicate are: (1) the landowner opens a road to public travel; (2) acquiescence in the use of the road as a public road; and (3) the fact that the public has used the road for an extended period of time." ***Klein***, 2012 WL 3518345, at *5 (citations omitted). "Implied dedication may be inferred '[i]f the acts are such as would fairly and reasonably lead an ordinarily prudent man to infer an intent to dedicate[.]'" ***Weeks v. Scott***, No. W2005-00584-COA-R3-CV, 2006 WL 521442, at *4 (Tenn. Ct. App. Mar. 3, 2006) (quoting *Johnson City v. Wolfe,* 52 S.W. 991, 992 (Tenn. 1899)). "While dedication is not dependent on duration of the use, extended use is a circumstance tending to show an intent to dedicate." ***Id.*** (citing *Cole v. Dych,* 535 S.W.2d 315 (Tenn. 1976)). An intent to dedicate is inferrable when the roadway is repaired and maintained by the public. ***Id.*** (citing *Burkitt,* 59 S.W. 429). Finally, "[a]n implication of public *acceptance* arises from 'a general and long-continued use by the public as of right.'" ***Peach v. Medlin***, No. W2003-02152-COA-R3-CV, 2004 WL 948481, at *10 (Tenn. Ct. Apr. 28, 2004) (quoting *Shahan v. Franklin County*, No. M2002-00725-COA-R3-CV, 2003 WL 23093836, at *5 (Tenn. Ct. App. Dec. 30, 2003)) (emphasis added).

Extensive evidence and testimony relevant to the roadway's nature as public or private was presented in this case over three days. At the July 2006 trial date, Jim Blankenship testified first for Mrs. Lay. Mr. Blankenship was born in 1942 and he lived on property adjoining that of Millard Wallace until 1960. Mr. Blankenship testified that the roadway "was called Thomas Maxwell Road. [That's] what we call[ed] it[,]" and that the road was open to "[a]nybody that wanted to [travel it], the public or anybody that wanted [to] could go through there." He stated that "in the '50s[,]" Herbert Fiddler, Will Moore[7] and Mr. Blankenship's father lived on the roadway, and that the Maxwells, the Fiddlers and the Moores had no way to access their properties without traveling the T.M. Maxwell Road. According to Mr. Blankenship, mail was delivered on the road to "at least three" mailboxes, and he identified a recent photograph allegedly depicting the remains of Herbert Fiddler's

---

[7]Mr. Moore is the predecessor in title to Iris Carrington.

-5-

mailbox post on the road. Additionally, he stated that "in the late '40s early '50s" he personally observed the county maintaining the T.M. Maxwell Road "once or twice a year[.]" He claimed that from 1942 until he left in 1960, that there were no obstructions blocking the road and that there was only one place in the road "that you usually had any trouble" traversing due to rain. Mr. Blankenship testified that after he moved in 1960, he continued to use the road for raccoon hunting "all the time."

Catherine Wallace Allen, first cousin of defendant Millard Wallace, testified next for Plaintiff. Ms. Allen was born in 1920 and she moved from the area in question in 1946. According to Ms. Allen, the Maxwells and the Fiddlers lived one-quarter mile off of the road, but she stated that the roadway was unnamed. Ms. Allen testified that her mailbox was near the road and that she saw the mail delivered "up and down" the road "[e]very day." She stated that "[the county] would do work on [the road] and then come by our house, but it was mostly drawn with mules when I was a kid." However, Ms. Allen later conceded that she was unsure whether it was the county and not the landowners who maintained the road. When asked who used the road, Ms. Allen answered, "Everybody that wanted to []. It was a public road." She stated that she had traveled the road by car and by wagon, and that "everybody traveled it when I was up there. . . . it was a road for everyone to use."

Frank Scott, a licensed surveyor hired by Mr. Lay to locate the road, also testified. Mr. Scott placed the roadway age at "approximately 70 years" and he stated that it "[l]ooked like an old used dirt road . . . between 15 and 20 feet wide. . . . [with] banks and then field sections - - side sections." Several maps were introduced during Mr. Scott's testimony. Mr. Scott identified the T.M. Maxwell Road on a 1936 Tennessee Valley Authority ("TVA") map; however, the map included no road names. The map depicts the roadway as something more than a "trail," and it shows three driveways attached to the T.M. Maxwell Road, three buildings on the roadway itself, and three additional buildings attached to the driveways.

Mr. Scott also identified the T.M. Maxwell Road on a 1938 General Highway and Transportation Map of Henderson County prepared by the Tennessee State Highway Department. The road is shown as an "unimproved road" with four "in-use" occupied dwellings.[8] However, the map included no road names.

On a 1950 TVA map, Mr. Scott identified the T.M. Maxwell Road as an "[u]nimproved dirt" road. The map depicts one building on the roadway, itself, and three additional buildings attached to appendages extending from the T.M. Maxwell Road. However, Mr. Scott acknowledged that TVA maps could depict a private road. **(V4, 90)**.

---

[8]Like many roads in the area, Blankenship Road and Mt. Ararat Cemetery Road are also depicted as "unimproved road[s.]"

Additionally, on a 1955 General Highway Map of Henderson County prepared by the Tennessee State Highway Department, Mr. Scott identified the T.M. Maxwell Road as a "graded and drained road" with two "in-use" occupied farm dwellings; however, no road names appeared on the map.

The defendants also introduced two maps during Mr. Scott's testimony. The defendants introduced a 1963 General Highway Map of Henderson County which did not depict or name the T.M. Maxwell Road; however, Mr. Scott noted that no unimproved roads were depicted. The defendants also introduced a 1983 General Highway Map of Henderson County, which depicted and named both Blankenship Road and Ararat Cemetery Road, but which depicted no roadway extending between Blankenship Road and Ararat Cemetery Road–the location of the T.M. Maxwell Road.

Plaintiff Thais Lay's husband, Brent Lay, testified both at trial and by deposition.[9] He stated that when Mrs. Lay purchased the 296.53 acre property from Edward Fiddler[10] in 1999, that Mr. Fiddler informed him that the T.M. Maxwell Road was a public road. Mr. Lay claimed that after his wife purchased the property, he and/or his agents used the T.M. Maxwell Road without objection for several years. He claimed that in 2000, his timber crew worked his wife's property for three weeks, traveling the T.M. Maxwell Road "probably several hundred times." In his deposition, he stated, "I drove my pickup back there. I drove a four wheeler back there. I carried a tractor. I carried a tractor and a disk, had a dozer back there twice." However, at trial he acknowledged that "[t]here was already an existing gate or a cable on the north end" of the T.M. Maxwell Road, and that he had used the road for logging purposes only after getting Millard Wallace to unlock the cable. He claimed that in February 2002, Millard Wallace told him that he could no longer utilize the road for timber removal unless he paid a $300 fee, which Mr. Lay refused to pay.[11] Additionally, he stated that Iris Carrington had denied him access to the T.M. Maxwell Road due to "the elements" even though, according to Mr. Lay, Mrs. Carrington had acknowledged that the roadway "was an old county road" and she had requested that the county install gravel on the portion of the roadway her son was using as a driveway.

He stated that since his wife's purchase, he had seen no public entities maintaining the T.M. Maxwell Road, and that until 2002, he, himself, had performed maintenance "three or

---

[9]Mrs. Lay testified by deposition that although the property was purchased in her name, she was mostly unfamiliar with the property as Mr. Lay had handled its acquisition and subsequent dealings.

[10]Edward Fiddler inherited the property from his father, Herbert Fiddler.

[11]The parties dispute whether the fee was for access or to compensate Millard Wallace for alleged damage to the road.

four times" on "about 75 percent of the road." Mr. Lay acknowledged that the last occupied building/dwelling on the T.M. Maxwell Road was the "Fiddler house," which became uninhabited in the "[e]arly '50s." Mr. Lay testified that a timber company hired by Millard Wallace had contacted him in 2003 seeking permission to utilize the T.M. Maxwell Road where it crossed Mrs. Lay's property. Mr. Lay stated that he granted the request, and that the road was so used. However, he acknowledged that since 2003, he was unaware of any "significant use" of the roadway by anyone. In his deposition, Mr. Lay indicated that he had "researched the [county] records from the '60s up until 1997," but that he had been unable to find evidence that Millard Wallace had had the T.M. Maxwell Road closed.

Two 2006 maps obtained from the internet were introduced during Mr. Lay's trial testimony. According to Mr. Lay, these maps depict the T.M. Maxwell Road connecting Blankenship Road and Ararat Cemetery Road, although one map does not name the T.M. Maxwell Road and the other erroneously lists its name as "Sam Evans Road."

Jackie Ray Manis, who served on the Henderson County Commission from 1990 to 1998, and who worked for the Lexington Fire Department from 1987 to 2007, testified for the defendants at the trial on November 2007. He stated that he had researched the T.M. Maxwell Road at Millard Wallace's request in 1996 or 1997, and that at that time, the road was not included on the county road list because it was not being maintained by the county at that time. Furthermore, he stated that he has never known the T.M. Maxwell Road to be a public road, nor was he aware of any maps depicting it as such. However, in conducting his research, Mr. Manis was unable to determine whether mail was ever delivered on the road, and he did not walk the length of the road to know whether evidence of old mailboxes or homes remained.

Hershel Middleton, who began working for the Henderson County highway department in 1953 or 1954 and who served as Road Supervisor from 1976-1996, testified next. He indicated that he had never seen nor heard of the T.M. Maxwell Road, but he did not know whether people lived on the road years ago. He was unaware of the road ever being included on a county road list, but he acknowledged that such lists were not compiled until approximately 1990. Mr. Middleton stated that he, the road committee, and 911 determined which roads were included on the county road list. Mr. Middleton explained that inclusion on a Tennessee Department of Transportation map would not necessarily indicate that a roadway is public because such maps show "field roads" also.[12] Finally, he acknowledged that there were county roads which the county did not maintain, but he

---

[12]Although Mr. Middleton did not address specific maps, both the 1938 General Highway and Transportation Map of Henderson County and the 1955 General Highway Map of Henderson County are identified in the record as TDOT maps.

indicated "You do maintain *most* all your County roads sooner or later." (emphasis added).

The current Henderson County Road Supervisor, Harold Hensley, who had begun working for Henderson County as a road grader in approximately 1965 also testified for the defendants. Mr. Hensley was unaware of Henderson County ever maintaining the T.M. Maxwell Road, of the road ever being owned by the county, or of the road ever being included on the county road list. Like Mr. Middleton, Mr. Hensley testified that the county maintains the roads listed on the *county* maps, as opposed to those listed on the *state* maps. Mr. Hensley stated that he had visited each end of the T.M. Maxwell Road in 2006, but that he has "never been through it." He indicated that the road looked like "[j]ust a little ole bitty narrow thing that looked like a wagon road to me or - - it looked like a driveway on one end." Mr. Hensley recalled Iris Carrington requesting that gravel be added to the roadway due to her son's building a home nearby.

Aaron Woods, a Henderson County Commissioner since 1998, testified next. He stated that he would "probably" recognize the T.M. Maxwell Road only "as a field road" as he had never "been down" the T.M. Maxwell Road, nor had he been "on either end" of the road; he had been only on the "main road." He stated that since his birth in 1949, he had never known the T.M. Maxwell Road to be a public road. Moreover, to his knowledge, since joining the commission, the T.M. Maxwell Road had not been included on the county road list nor had it been maintained by the county. Mr. Woods stated that the county maintains only *county* roads and that no one had approached him about maintaining the T.M. Maxwell Road, nor had anyone discussed with him the opening or closing of the T.M. Maxwell Road.

At trial, Jay Smith, a procurement forester for Middle Lumber, which buys saw mill timber, testified that he had been on the T.M. Maxwell Road in the early to mid 2000s to estimate timber values. However, he indicated that he could not travel the entire length of the road because "that road was, in a sense, impassible" in his truck due to rainfall. He further indicated that the road did not seem to be recently traveled.

Defendant Millard Wallace's son, David Wallace, who was born in 1950, testified that when he was growing up in the area at issue that the T.M. Maxwell Road could be traveled from end to end by foot or horse. He stated that the Fiddlers, the Maxwells, and the Moores used the T.M. Maxwell Road to access their residences, but that "Mr. Fiddler, who moved out in the early '50s is the last person I know of that used that road." Since his childhood, he has seen no vehicles on the road, and he agreed that other than "an occasional timber cutter or somebody hauling wood out of there," he had seen no commercial activity on the road, nor had he ever seen the county maintaining the road.

David Wallace stated that, currently, the road is "nowhere in the condition that it was

before[,]" and that the "section on the south end is impassible by vehicle, it has been for several years. As a matter of fact, there's trees growing up in it on the Carrington end of it." He stated that the northern portion of the T.M. Maxwell Road was also grown up until he "opened it up in the late '90s[.]" After opening up the north end of the roadway in approximately1997, he saw "[h]unters and so forth" "coming down through" the T.M. Maxwell Road until he cabled it off to "keep intruders off." David Wallace similarly testified that Homer Carrington[13] had erected a gate across the road "in the early '60s" which, he claimed, is still standing. David Wallace stated that the Lays "were given permission to cross [the Wallace's] property" until 2002.

Defendant Millard Wallace testified that he was born in 1915 and that he grew up in the area in question. He claimed that the road was unnamed until the engineer/surveyor included the title "T.M. Maxwell public road" in his 1946 deed whereby he purchased his property from W.A. Carrington and wife, Neila Mae Carrington. Millard Wallace did not know who built the road, but he stated that the road was "there in the early '20s or early '30s." Millard Wallace acknowledged that the driveways of the Maxwells, the Moores and the Fiddlers extended off of the T.M. Maxwell Road, but he claimed that he never saw anyone receiving mail there. Millard Wallace denied using the T.M. Maxwell Road and he stated that he "never seen anybody on it [sic]." However, he admitted that the Fiddlers used the road, that the Moores used it "if they needed it[,]" and he stated "I'd assume that people that wanted to go through there used it[.]" In his deposition, he acknowledged that "back in the 30's and 40's[,]" [m]ostly [the] Fiddler and Maxwell [families]" used the road to access their homes, and he stated "it's never been a public road. . . . But people traveled it. Don't misunderstand me. People used it."

Millard Wallace denied ever seeing the county maintain the road stating, "There wasn't no work done. Just people lived on it [sic]." He stated that the "road was never a very transportable road. In the winter, just forget about it. You couldn't get through it. [A certain section of the north end] was swamp like, wasn't no bridge, no culvert [sic]." When asked about the cessation of road use, Millard Wallace answered, "The Fiddlers, in the 1950s. The Maxwells, somewhere along about '48 or '[4]9 in there. The Fiddlers moved out in 1950, and [the road] had been closed for 50 odd years when this ruckus all started." He stated that since the Fiddlers and the Maxwells ceased using the road, that no one had traveled it except hunters who would "sneak in there and hunt . . . . And it was one time back in the later '60s they graded a place back there on the Fiddler property or the Lay now and they were growing marijuana." In his deposition, Millard Wallace corroborated his son, David Wallace's, testimony that in 1996 or 1997, a cable, which was still standing at the time

---

[13]Homer Carrington, the deceased husband of Iris Carrington, purchased his property from Will Moore.

of the deposition in 2004, was placed across the T.M. Maxwell Road to prevent access by hunters. However, he also stated that when the property was surveyed near the time of Mrs. Lay's purchase that "we cleared the road where the surveyor and the people that wanted to see the property could go down it and there wasn't no cable across the road and we had out of the way. Didn't try to hinder nobody [sic]." He also testified that Homer Carrington had attached a cable across the southern portion of the roadway in 1949,[14] which remained, and that Mr. Lay had likewise constructed a gate across "the first stretch of the road that's on his property[.]"

The final trial witnesses were Defendant Iris Carrington's sons, David Carrington and James Alexander. David Carrington has lived in the area at issue since his birth in 1960. He stated that when he was a young child, the T.M. Maxwell Road was "grown up; trees, limbs crossing, bushes" and that he had never seen school buses or mail carriers on the road, nor had he observed the county maintaining the road. Regarding the road's current condition, he stated "Maybe about 500 foot if it coming off of [Ararat] Cemetery Road. We use it to get up to the barn to feed the cows, and we've always used that. From there on, you couldn't get through it if you wanted to. Maybe on a horse."

James Alexander moved to the area at issue in 1958, but he stated that he never observed the T.M. Maxwell Road in the 1950s or 1960s, and that by 2005, the road appeared like "[d]irt and underbrush." In the 1960s, beyond his own parents' use of the road in the farming operation, Mr. Alexander saw no traffic on the road including school buses or mail carriers , nor did he observe the county maintaining the road. Mr. Alexander acknowledged having been told that families previously lived on the road, and he admitted to using the road to access his current home.

Mrs. Iris Carrington testified by deposition in this matter.[15] Mrs. Carrington and/or her husband, purchased their property in 1961, but Mrs. Carrington had lived in the area in question since "the late 1950[]s to early 60." Mrs. Carrington did not know the history of the T.M. Maxwell Road or who had built it. She stated that when the property was purchased, there was only a single "old rundown building" on the road and that nobody was living there and had not lived there for a number of years." She claimed, "there's only one place I have seen [the T.M. Maxwell Road] called a public road[–the 1946 deed to Millard Wallace]. It is just an old dirt field road that leads off [] Ararat Cemetery Road and goes up to the backside of my property. . . . It's really not a road. It's just a trail." According to Mrs.

_____

[14]David Wallace testified that Mr. Carrington had erected a gate across the road "in the early '60s[.]"

[15]Prior to the conclusion of trial, Mrs. Carrington became permanently physically and mentally incompetent and unable to attend and testify at trial.

Carrington, the entire Carrington property can be accessed from Ararat Cemetery Road, and farmers who have rented her property have not accessed her property other than by Ararat Cemetery Road. However, she later stated that since the early 1960s, she knew only of the T.M. Maxwell Road being used by "Family, myself, my family. When Homer [Carrington] was living, he would use it." She testified, "The only time I've been on [the T.M. Maxwell Road] is going [by tractor or pickup] to pick up my husband or somebody that was in the field and they needed to come to the house or something to that effect."

In its July 16, 2009 Order, the chancery court found that the T.M. Maxwell Road was not currently, nor had it even been, a public road. As indicated above, the chancery court entered a thorough letter, which was attached to, and incorporated into, a July 16, 2009 Order. The court found the relevant facts as follows:

At points of time in the distant past, people have lived on land adjacent to [the T.M. Maxwell Road]. There was proof that there was no obstruction on the Road up to at least 1960. There was some testimony that in the far past, that mail had been delivered to residents living on property adjacent to that Road and that the county had possibly [performed] some work on the Road by cleaning out some ditches. No one lives on that Road now, or uses it to access their residence. One of Plaintiff's witnesses, Catherine Allen, testified that she was last on that Road in 1946. Mr. Jim Blankenship testified he was last on it in 1960. Frank Scott, Jr., a surveyor from Decaturville, looked at the Road for the Plaintiff-Lay and found part of the Road bed on Lay's property. He described it as an old dirt road, 15-20 feet wide with some side ditching, and banks on each side. He also produced a 1938 official Henderson County map showing the Road and some buildings close to the Road. From 1955, the map of Henderson County indicates two buildings on the Road. The legend indicates it is an unimproved Road. He testified the Road bed had been in the same general location for over 70 years. There is no evidence on the maps that names the Road. He agreed that on the 1983 Henderson County Highway Map [] that this road does not appear on it. He also admitted that [] the 1963 Henderson County Highway Map does not show this Road other than as an unimproved Road. A description contained in the deed from W.A. Carrington and wife to Millard C. Wallace and wife makes mention of the T.M. Maxwell public road as one of the points in the description. This deed is dated June 22, 1946. No other deeds of property in the area refer to that Road. . . . Plaintiff has used the Road in the past. In February 2002, Plaintiff and her husband [at]tempted to use the Road to haul out some logs from a log cabin. [Millard] Wallace stopped them from using the Road. . . . Plaintiff's husband talked to [Iris] Carrington about coming out the south end and Carrington refused

access. . . . Lay's witnesses testified that [Millard] Wallace had used the Road in 2003 to haul timber and had come over on to Lay's property when utilizing the Road.  After 2003, Plaintiff[]s report that a large hole was dug in the Road on the north end to prevent further access.  A chain, or cable, was put across the Road on the south end on Carrington's property.

Defendant[s'] witness, Herschel [Middleton], was the Henderson County Road Supervisor for twenty years and began work with the Highway Department in 1953.  He testified that he knew the general vicinity of the Defendant's property and had never heard of the T.M. Maxwell Road.  Harold Hensley, who succeeded Mr. [Middleton] as Road Supervisor also ran a road grader twenty five years before that for the Highway Department starting in 1965.  He testified that the County had not maintained this Road to his knowledge.  He testified that Maxwell road does not appear on the County Road Map at the Highway Department.   Aaron Woods, a County Commissioner for nine years and a member of the Road Committee, testified that he only knew the Road as a field road and that the County had not maintained it in his time.  It is not on the County Road List. David Wallace, Defendant's son, testified that he hunted the area as a child and had used the Road on foot and on horse, but never used a wheeled vehicle.  He had never seen a car or vehicle on the road.  He was aware that his father put a cable on the north end in the late 1990[]s to keep intruders and hunters out.  He also testified Homer Carrington put a gate on the south end in the early 1960[]s.  Millard Wallace, the Defendant, testified that he has lived in the area since 1946, grew up on an adjoining farm and knew the people who lived on this Road. He testified that the name "T.M. Maxwell Road" came from a surveyor, Mr. Neely, who put it in a 1946 deed and that other than that, the Road never had a name.  He testified that he never saw any county work being done on the Road and that while the Fiddlers and Maxwells lived on the Road and used it, winter travel was impossible except by horse.  He testified the Fiddlers stopped using the Road in the 1950[]s and the Maxwells stopped around 1950.  He testified no one has used the Road since then but hunters.  David Carrington testified that he was Defendant-Carrington's son and that he grew up knowing the property.  He testified that only about 500 feet off of the Ararat [Cemetery] Road was usable and that he had never seen the County work on the Road.  This was confirmed by James Alexander, Mrs. Carrington's son.

In its "Analysis and Ruling," the court stated as follows:

> Plaintiff has been unable to produce little, if any, substantial evidence that this
> Road was a public road. There is no evidence the County ever designated it
> as a public road. There is no evidence as to who built the Road, or that it was
> ever accepted by the County for County maintenance. There is no action
> shown by the County to abandon the Road. No map in evidence has put a
> name on the Road. It is not shown on any Henderson County map after 1963.
> Henderson County Road Commissioners and Supervisors testified it has not
> been maintained by the County to their knowledge over many years. The fact
> that it may have been worked on a few times by County equipment is not
> sufficient to establish it as a County road. Neither is the fact that a mail carrier
> may have driven up and down it and delivered mail to residents long ago. The
> fact that it is shown on County maps is not sufficient to have it designated as
> a County road. There have been no residents on the land adjacent to the Road
> for many years since at least 1960. Plaintiff is not able to prove that the
> Defendants expressly dedicated the Road to the public. There is little evidence
> that the Road was a public road or that the public had accepted it as a public
> road and there is no evidence that the owners intended that the Road become
> public. Plaintiff may prove that private land may become public as a result of
> an implied dedication, but Plaintiff must prove this by clear and convincing
> evidence that there was a plain and unequivocal intention on the owner[']s part
> to appropriate the property to public use and that the owner intended to
> permanently part with his property and vest [it] in the public. The proof in this
> regard fails. The Court did not find clear and convincing proof that there was
> a plain and unequivocal intention on the part of the Defendants to appropriate
> the property to public use, or that the Defendants intended to permanently part
> with their property and [to] vest it in the public.

Again, on appeal, Mrs. Lay apparently concedes that the roadway is *no longer* public.
Instead, she argues that the roadway was public *prior to 1960*, and, therefore, even though
it has since been abandoned as a public road, that she is entitled to a private easement of
access over the road. She claims that many of the trial court's findings are either inaccurate
or irrelevant to the issue of the roadway's status as public or private. For example, she
claims that the trial court incorrectly stated that the T.M. Maxwell Road crosses over her
property *twice* "for a short distance," when Mr. Lay's deposition testimony demonstrated that
the roadway crosses her property *three* times, covering 1,700 feet. She also claims that the
trial court incorrectly found that the county had "possibly [performed] some work on the
Road by cleaning out some ditches[.]" Mrs. Lay correctly points out that the 1955 General
Highway Map of Henderson County describes the T.M. Maxwell Road as a "graded and

drained road" and she suggests that the road's condition necessarily implies county maintenance. Mrs. Lay also cites testimony from two witnesses as purported support for her contention that county maintenance beyond ditch work was performed; however, the cited testimony states only that ditch work was performed, and one of the two witnesses conceded that maintenance was performed "mostly . . . [by] the people that lived in the community" and she was unsure whether any of the ditch work was actually performed by the county.

In her brief to this Court, Mrs. Lay contends that the trial court erred in finding that the 1938 General Highway and Transportation Map of Henderson County showed only "some buildings close to the Road[,]" when the map, in fact, depicted four "in-use" occupied dwellings, and that the trial court erred in finding that the 1955 General Highway Map of Henderson County "indicates two buildings on the Road" when surveyor Mr. Scott identified two *"in-use" occupied farm dwellings* along the road. She also claims that many of the trial court's findings were irrelevant to the issue of whether the T.M. Maxwell Road was a public road prior to 1960, including: that there is no evidence of who built the road; that the road's name is not listed on maps, as the early maps introduced do not include road names; that the road was not depicted on the 1963 and 1983 General Highway Maps of Henderson County; and that no one has resided on the road since 1960. Additionally, she contends that the testimony of county employees and area residents regarding post-1960 activity on the road is irrelevant to whether the road was public prior to 1960. In sum, Mrs. Lay argues that the combined weight of the evidence–residences along the road, county maintenance of the road, delivery of mail on the road, and the road's depiction on early maps–demonstrates that the T.M. Maxwell Road was a public road at some time prior to 1960.

As stated above, private land may be implicitly dedicated for use as a public road. *See **Klein***, 2012 WL 3518345, at *4 (citing *McCord*, 302 S.W.2d 331). The inquiry focuses on whether the landowner intended to dedicate the land to public use. *Id.* (citing *McCord*, 302 S.W.2d 331; *Johnson City*. 52 S.W. 991; *Nicely*, 232 S.W.2d 421). Proof of intent "must be unequivocal, but intent may be inferred from surrounding facts and circumstances." *Id.* (citing *Cole*, 535 S.W.2d 315). Relevant factors include whether the land is opened to public travel, whether the landowner acquiesces in the use of the road as a public road, whether the public uses the road for an extended period,[16] and whether the road is repaired and maintained by the public. *See id* at *5 (citations omitted). Additionally, the public may implicitly accept the landowner's dedication of a roadway as public from general, long-term use of such. *See **Peach***, 2004 WL 948481, at *10 (citation omitted).

---

[16]"[U]nlike an easement by prescription, an implied dedication does not depend on use for any particular period of time." ***Davis v. Bowers***, No. E2011-00295-COA-R3-CV, 2012 WL 762442, at *11 (Tenn. Mar. 9, 2012) (citing *Johnson City*, 52 S.W. at 922; *Scott v. State*, 33 Tenn. 629, 633 (1854)).

The evidence presented by the parties relates primarily to two different time periods: Plaintiff's evidence relates to *pre-1960* and Defendants' evidence relates to *post-1960*. It appears that since 1960, no one has lived along the T.M. Maxwell Road, the road has been traversed only minimally and an obstruction has been placed thereon, and the road has not been maintained by Henderson County nor considered by the county to be a public road.

However, the circumstances surrounding the road prior to 1960 are much different. Plaintiff's witnesses testified that several families lived along the road until the 1950s, that these families relied upon the roadway for residential access, and that their mail was delivered along the road. Plaintiff's witnesses also testified that prior to 1960, the roadway was of a usable condition, it was unobstructed, and it was open for public use and "everybody traveled it[.]" Additionally, one witness testified that "in the late '40s early '50s" he personally observed the county maintaining the T.M. Maxwell Road "once or twice a year[.]" Defendant Millard Wallace, who was born in 1915 and grew up along the road, acknowledged that families lived along the road, but he claimed he never saw mail delivered along the road, nor the county maintaining it.[17] Confusingly, he testified that he "never seen anybody on [the road,] [sic]," but he also conceded that families used the road to access their homes and that although "it's never been a public road. . . . people traveled it. Don't misunderstand me. People used it."

In finding that the T.M. Maxwell Road was never a public road, the trial court noted the lack of evidence as to who built the road and the lack of evidence that the *county* ever accepted or abandoned the road. It also noted that the road was not named on early maps, that it was not shown on any Henderson County Map post-1963, and that it had not been maintained by the county for many years. The court reasoned that "[t]he fact that it may have been worked on a few times by County equipment[,] . . . . the fact that a mail carrier may have driven up and down it and delivered mail to residents long ago[, and t]he fact that it is shown on County maps[,]" is insufficient to demonstrate dedication of the road to public use. We disagree with this conclusion.

According to all witnesses familiar with the area prior to 1960, prior to approximately 1960, the T.M. Maxwell Road was, for many years, open to public travel, and the lack of obstructions during this time period indicates that the landowners acquiesced in its public use. Two disinterested witnesses recalled mail delivery along the roadway, and one witness identified a photograph allegedly depicting the remains of a prior resident's mailbox post on the road. A disinterested witness testified to personally observing the county maintaining the roadway "once or twice a year" "in the late '40s early '50s[,]" and a county map from this time period identifies the roadway as a "graded and drained road[.]" That early maps did not

---

[17]The trial court made no explicit credibility determinations in this case.

include the "T.M. Maxwell Road" name is insignificant as such maps included *no* road names. Additionally, the early maps indicated the presence of buildings along the roadway, itself, as well as along driveways attached to the road. Although these factors, individually, might provide insufficient support for a public road determination, we find that, in tandem, the evidence is such that no other reasonable explanation beyond public dedication can be maintained, *see Sanders*, 1998 WL 57532, at *3, and that the evidence "'would fairly and reasonably lead an ordinarily prudent man to infer an intent to dedicate.'" **Weeks**, 2006 WL 521442, at *4 (quoting *Johnson City*. 52 S.W. at 992). Additionally, we find that public acceptance may be inferred in this case due to the roadway's apparent "'general and long-continued use by the public as of right'" prior to 1960. **Peach**, 2004 WL 948481, at *10 (quoting *Shahan*. 2003 WL 23093836, at *5).

### B. Necessity

Having found that the T.M. Maxwell Road was a public road prior to 1960, however, does not end our inquiry into whether Plaintiff possesses any current rights of access. None of the parties contends that the T.M. Maxwell Road is currently a public road, and the evidence fully supports the conclusion that the roadway was abandoned by the public prior to approximately 1960. Although the law is clear that "[o]wners of property abutting a once public road continue to have a private access easement over that road to their property even after the road loses its character as a public road[,]"[18] *Hall v. Pippin*, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998) (citing *Knierim v. Leatherwood*, 542 S.W.2d 806, 810 (Tenn. 1976), Defendants contended at oral argument before this Court that a private easement following abandonment arises only if access via the now-abandoned roadway is *necessary*.[19] Defendants allege that Plaintiff may access the entirety of her property via a roadway other than the T.M. Maxwell Road, and therefore, that even if the T.M. Maxwell Road is a once-public, now-abandoned road, that Plaintiff enjoys no private easement of access over the road.

We agree that necessity must be demonstrated in order for a private access easement to arise following public abandonment. In *Ty Farming Co., Inc v. Belew*, this Court stated:

> The law is clear that, even after a public road is abandoned, the abutting

---

[18]A landowner may abandon a private easement which arose following abandonment of a public road. **See Hall v. Pippin**, 984 S.W.2d 617, 620 (Tenn. Ct. App. 1998). Abandonment by Plaintiff, however, is not alleged in this case.

[19]Defendants do not contend that Mrs. Lay was required to own her property *during the time period* in which it was a public road. Thus, we will not address this issue on appeal.

-17-

nlandowners continue to have a private easement of access to their premises over the old road. *The landowner's easement, however, is limited to such streets or ways as are necessary to the landowner's ingress or egress.*

No. 93-285, 1996 WL 649173, at *4 (Tenn. Ct. App. W.S. Nov. 8, 1996) (emphasis added) (citations omitted).

At trial, Mr. Lay acknowledged that he has "maybe a half mile to a mile of road frontage off of Blankenship Road," but he testified that using the T.M. Maxwell Road was "the only way to get to the *south side*" of his wife's property. (emphasis added). He explained that he had built a "four wheeler trail" "less than half a mile" long to access a *portion* of the southern property, but that full southern property access could be accomplished only by constructing an additional one-half mile length of roadway after crossing an eight-foot deep ditch. Mr. Lay opined that completing the road would require "the use of a bridge or culvert and extensive [excavation,]" which he claimed would be "fairly cost prohibitive[.]" However, at the time of trial, Mr. Lay had no estimate as to road construction costs.

In considering the level of "necessity" required to claim an easement across an abandoned but once-public road, we find instructive, case law setting forth the "necessity" required to claim an "easement by necessity." This Court has stated that to establish an easement by necessity, "strict necessity" is not required, but "the degree of necessity must be more than 'mere convenience.'" ***Newman v. Woodard***, 288 S.W.3d 862, 868 (Tenn. Ct. App. 2008) (quoting *Cellco Partnership v. Shelby County*. 172 S.W.3d 574, 592 (Tenn. Ct. App. 2005)). "Where the claimant has another reasonable or practicable mode of ingress or egress, this Court will not imply a way of necessity." ***Id.*** (citing *Cellco*, 172 S.W.3d at 593). "Where the party claiming the right can, at reasonable cost, create a substitute on his own estate the easement is not necessary." ***Id.*** (citing *Line v. Miller*, 309 S.W.2d 376 (Tenn. Ct. App. 1957)). The degree of necessity in a given case is a question of fact. ***Walker v. CSX Transp., Inc.***, No. M2010-00932-COA-R3-CV, 2011 WL 578780, at *3 (Tenn. Ct. App. Feb. 16, 2011) (citing *Harris v. Gray*, 188 S.W.2d 933, 935 (Tenn. Ct. App. 1945)).

Regarding Mrs. Lay's claimed necessity of accessing the T.M. Maxwell Road, the trial court found:

[I]t is undisputed that Plaintiff has full access to her property. Plaintiff is not land-locked. Plaintiff has ingress and egress. There was testimony that Plaintiff had some difficulty accessing the southern portion of her property, but there was no proof that it was impossible. Plaintiff also presented proof that she was in the process of making access to the southern portion of her property by a new access on her own property. All that is necessary is to install a

culvert over a ditch. There was no testimony as to the cost, although there was testimony by the Plaintiff's witness that it was cost prohibitive. Plaintiff is not entitled to the most convenient access to her property. Where a plaintiff has another reasonable or practicable mode of access, a court will not imply a way of necessity.

We find the evidence presented does not preponderate against the trial court's factual conclusion that installation of a roadway crossing only Plaintiff's property is a practical method for gaining access to the southern portion of her property. Thus, in the absence of necessity, Plaintiff is not entitled to access the once-public, but since abandoned T.M. Maxwell Road. The chancery court's dismissal of Plaintiff's complaint is affirmed.[20]

## IV.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the chancery court. Costs of this appeal are taxed to Appellants, Thais Lay and Brent Lay, and their surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

---

[20]"The Court of Appeals may affirm a judgment on different grounds than those relied on by the trial court when the trial court reached the correct result." *City of Brentwood v. Metro. Bd. of Zoning Appeals*, 149 S.W.3d 49, 60 n.18 (Tenn. Ct. App. 2004).